# CITY OF DENVER *v.* MULLEN *et al.*

(*Supreme Court of Colorado, April 25th, 1884—Error to the District Court of Arapahoe County.*)

1. MUNICIPAL AUTHORITY—NUISANCES CANNOT BE ABATED BY ORDER OF CITY COUNCIL. A provision in the charter of a city conferring authority on the council "to make regulations to secure the general health of the inhabitants, to declare what shall be a nuisance, and prevent and abate the same," will warrant the declaration by general ordinance of what shall constitute, and the conditions and circumstances under which a given thing shall become and be deemed a nuisance; but does not authorize the council by mere resolution or motion arbitrarily to declare any particular thing a nuisance which has not theretofore been pronounced to be such by law, or so adjudged by judicial determination.

2. NUISANCES—ABATEMENT OF. Only those nuisances may be abated summarily, which affect the health or interfere with the safety of property or person, or are tangible obstructions to streets and highways, under circumstances presenting an emergency, etc.—such as are clear cases of nuisance *per se*. In other cases judicial determination is necessary before a thing can be abated as a nuisance, either by the public or a private person.

3. SAME—SAME. A nuisance which is exclusively common or public cannot lawfully be abated at the suit of private individuals—the remedy is by indictment or criminal prosecution, unless other remedy has been provided by statute. A private nuisance may be abated by the party aggrieved; a nuisance which is both public and private may be proceeded against either by the public, or by the private individual affected thereby. In case of private nuisance, the aggrieved party may elect to abate the same, or have his action for damages. A civil action by the proper officers on behalf of the public, will also lie to abate a public nuisance.

4. SAME—SAME—RULES. Almost every case involving the question of nuisance in the use of property, is to be determined in view of its own circumstances, and as a general rule, the relative rights of the parties control—the question being whether or not the use of the property in the manner complained of is reasonable, and in accordance with such relative rights. What constitutes a nuisance is a question of law for the Courts; whether the results of a given business are so common as to amount to a public nuisance, is a question of fact for the jury; as is the question, whether a particular use—not a misuse *per se*—is an unreasonable use and a nuisance.

5. CORPORATE EXISTENCE—DE FACTO. The corporate existence and validity of the acts of a *de facto* corporation whose user is established, cannot be attacked collaterally, upon the ground of an irregularity or omission in its certificate of incorporation.

6. STREETS DEDICATED WITH OBSTRUCTIONS THEREIN—DITCH CROSSING SAME. A municipal corporation which accepts the dedication of streets, across which a ditch has been previously located and right of way

therefor acquired, takes the same subject to the prior rights of the owners of the ditch. And when the necessities of the public require that such ditch be bridged at the street crossings, it is the duty of the city and not the owner of the ditch to construct such bridges.

7. TITLE TO REAL ESTATE--HOW FAR PATENT RELATES BACK. The government does not part with title to the public domain until the issue of a patent therefor; however, when such patent has issued, the title conveyed thereby is held to relate back to the date of the entry, as evidenced by the certificate thereof, but will not relate back to an act of Congress authorizing the entry merely.

8. CITY OF DENVER—ORIGINAL POWER OVER STREETS. The authority conferred by the act of 1861 incorporating the city of Denver, in respect to the control of the streets by the city, cannot be extended to invalidate the acquisition thereafter by ditch proprietors of the right of way through the lands which were then a part of the public domain, and prior to the acquisition of title thereto by the city, although the streets had been previously laid out and used as streets.

STONE, J. The defendants in error, J. K. Mullen, Dennis Mullen and Charles R. Davis, who were the plaintiffs below, applied to the Judge of the District Court for relief by way of injunction against the city of Denver, the mayor and the street commissioner thereof, to restrain the said parties from interfering with the flow of water in a certain irrigating and mill ditch, known as the Platte and Denver Ditch, which conveys water to the flouring mills of said complainants, situate in that portion of the city known as West Denver. The bill of complaint averred that the ditch was constructed in 1865 by a corporation incorporated in 1864 under the general incorporation law of the then Territory of Colorado; that the complainants were lessees of the said ditch company, possessing as such lessees the right to the use of the said water in operating the two flouring mills owned by the said Mullens and Davis respectively; that the grinding capacity of said Mullen mill is 1,150 bushels of wheat, and that of the Davis mill about 600 bushels each twenty-four hours; that said mills are run chiefly by water power from said ditch; that complainants had a right to the flow and use of said water for the purpose aforesaid, without interference by the defendants; that defendants had with force and violence torn out a certain flume in the said ditch and diverted the water therefrom, and were threatening to continue such diversion of the water, to the great and irremediable damage of complainants, and said complainants

therefore prayed a writ of injunction to restrain the said acts of defendants, and for all proper relief in the premises.

The answer of defendants below denied severally the allegations of plaintiffs' bill, and set up ownership in fee by the city of the streets and alleys therein, denied the right of plaintiffs to obstruct the same by the ditch wherever it crossed the same, and averred that the interference with the ditch was attempted and asserted only upon refusal of plaintiffs to bridge the streets at the ditch crossings so as to permit the free and convenient use of said streets by the public. The defense further set out, by way of cross-complaint for affirmative relief, that the ditch in question runs through and across the following named streets in Hunt's addition to the city, to wit: Carson, Martin, Bear, Buffalo, Moose, Deer, Olive, Capitol, South Tenth, South Ninth, South Eighth, and half of Colfax avenue, together with the intervening alleys; and also the following named streets within that portion of the original limits of the city known as the Congressional grant, to wit: Champa, Curtis, Lawrence, Larimer, Holladay, Wazee, Wynkoop, Eighth, Ninth, and a portion of Colfax avenue, together with the intervening alleys; that the said ditch and the conveyance of water therein is an obstruction to the public and necessary use of the streets; that the crossings of the said ditch in the streets, where the same are not bridged, are inconvenient and dangerous to the public; that the city rightfully owns and controls said streets, with authority to control and regulate the use of the same, and prays that the said ditch be abated, the water turned off and the ditch filled up, so as to prevent the further obstruction to the public use of the streets, and for full relief, etc.

To this answer a replication was filed denying the right of the city to interfere with the said ditch so as to prevent the flow of water to the mills of the plaintiffs, and averring that the grantors of plaintiffs had a right to said ditch and the use of the water therein, prior in time and superior in law to any claim of the city in respect to the streets and alleys where the same cross said ditch; that they have been in the undisturbed exercise of such right for nearly eighteen years; that the owners of the land through which the ditch runs, as well as the said city of Denver, have authorized and licensed the plaintiffs and their grantors to use the said ditch and convey the water

through the same for the purpose of operating said flouring mills, and that therefore the plaintiffs are not bound to bridge the ditch where the streets cross the same; that the ditch is used to irrigate a large extent of farming country along its line above the mills.

In reply to the matter of the cross-complaint of the defendants, the plaintiffs admit that the ditch, together with the waste water below the mills, runs through or across the streets mentioned in defendants' answer, but aver that as to all the streets and alleys in Hunt's addition, the ditch company acquired its right of way long prior to the time when said lands became a part of the city; that the ditch was constructed and used for more than ten years prior to said lands becoming an addition to the city; that said lands became a part of the city and were accepted by the city as such addition with full knowledge of all the existing prior rights of said ditch company therein, and therefore that plaintiffs were not bound to bridge said ditch where streets crossed the same in said addition; that in respect to the streets and alleys crossing said ditch within that part of the city included in the Congressional grant, plaintiffs reply that they had a vested right to said ditch and to the flow of the water therein long prior to the time when the city acquired or had any right to or authority over the said streets and alleys, or any title to the lands embraced in the said Congressional grant, and have exercised such prior rights unmolested by the city, and with the leave and license of said city, for the period of more than seventeen years, and hence are not bound to bridge the streets within the limits aforesaid.

A preliminary injunction was issued in accordance with the prayer in the complaint, and afterwards, in support of the respective allegations in the pleadings, proofs were taken before a referee, and the cause coming on to be heard upon the said pleadings and proofs, the Court decreed that as to the defendants, the mayor of the city and the street commissioner, they were not necessary parties to the action, and the same was therefore dismissed as to them.

The Court further decreed as follows, to wit:

"And the Court doth further find, order, adjudge and decree as to the defendant, the city of Denver, that the plaintiffs are lawfully and of right entitled to the full, unobstructed flow of

the water through and along the Denver and Platte ditch to the mills of the said plaintiffs respectively, without any let, hindrance or obstruction of the water in said ditch, and without any interference with said ditch by said city of Denver or its agents or employees; and doth further order, adjudge and decree that the said city of Denver, its agents, attorneys and employees, be forever restrained and enjoined from cutting down, or destroying or injuring the banks or flumes of the said Denver and Platte ditch, and from filling up or obstructing the said ditch or any part thereof, and from in anywise or manner interfering with said ditch or the water therein, so as to obstruct the flow of the water to the mills of the plaintiffs aforesaid, and from in anywise or manner diverting or turning the water from said ditch.

"And the Court doth further order, adjudge and decree that inasmuch as it appears to the Court that the said defendant, the city of Denver, is not entitled to any relief for any matter or thing set up or contained in the second defense of said defendants' answer, said second defense being in the nature of a cross-complaint and asking for affirmative relief, the said cross-complaint in said answer be dismissed. And it is further ordered by the Court, the said defendant, the city of Denver, pay the costs of this suit."

Exceptions were taken to the overruling by the Court of a motion to set aside the findings and judgment of the Court, and for a new trial, and thereupon the city prosecutes its writ of error herein.

Aside from certain objections relating to the admission of testimony, which will be referred to hereafter, the assignments of error may be summed up in the two numbered seventh and eighth, to wit: That the Court erred in its findings of law and facts, and in its judgment and decree for the defendants in error. Our main inquiry therefore is, whether upon all the facts and circumstances disclosed in the case, pertinent thereto, and upon the law properly applicable thereto, the judgment and decree of the Court below was warranted and should stand.

The city, in its attempted interference with the ditch, evidently proceeded upon the theory that such ditch, with respect to the streets of the city which it crossed, and the public use

thereof which it incommoded and obstructed, was to be deemed and treated as a nuisance, which, on behalf of the public affected thereby, the said city had authority to abate as such in the summary manner pursued. The correctness of this position is contended for by the city attorney in argument filed herein.

From the testimony and exhibits taken and filed in the cause, it appears that on the 6th of March, 1882, a written notice, signed by Robert Morris, the mayor of the city, was served the same date upon Davis, one of the defendants in error, ordering him "to remove the obstruction now in Carson street, in the city of Denver, within thirty days from the service of this notice, the said obstruction being a mill ditch crossing said street, which ditch you must remove or properly bridge so that the public convenience in the use of said street will not be interfered with by the said ditch," etc. The like notice, dated the 11th of March, was served upon John K. Mullen, one of the other defendants in error. On the 5th day of May, following, on motion adopted by the city council, "the street commissioner was ordered to turn off the water in the mill ditch, and fill it up at the crossing of Colfax avenue;" and on the 18th of May thereafter, the following motion was adopted by the said city council, viz: "On motion of Alderman Lessig, the street commissioner was again instructed to divert the water of the West Denver mill ditch into the Platte river or Cherry creek inside the city limits, as may be prescribed by the city attorney." Mr. Stallcup, the then city attorney, testifies, that after the adoption of the foregoing second motion or resolution, Mr. Mullen called at his office, and a meeting was arranged at which the plaintiffs below and their attorneys appeared, when said plaintiffs proposed to pay half the expense of bridging Wazee and two other streets, but which proposition was refused, and nothing further was done by way of compromise, and that he, said city attorney, then instructed the street commissioner to turn the water out of the ditch at a point within the congressional grant part of the city, and to convey the same into the irrigating ditches and into Cherry creek, but that nothing was done, as the mayor was served with process in this suit on that or the following day.

It further appears in testimony that certain officers of the

city, shortly after the passage of the resolutions by the council, turned the water out of the ditch by opening the side gates, and cutting the banks of the ditch near the head gates, and by breaking the flume below the head gates, throwing the planks out into the river and effectually stopping the flow of water in the ditch; that this was at a point six or seven miles from the mills, and three or four miles beyond the limits of the city; that finding the water gone out of the ditch, Mullen and Davis went to the head of the ditch and attempted to repair the break and turn the water in again, when about midnight, several persons representing themselves to be officers of the city, interfered and prevented such repairs, showing their arms, pistols and cartridges, and stating that they were instructed to use their arms if necessary, and one of them saying, as the witness Davis testifies, that "they had instructions to blow hell out of any one attempting to turn water in the ditch."

It will scarcely be contended that this manner of proceeding was in accordance with either the resolutions of the city council, above set forth, or the instructions of the city attorney, nor can it be contended that there was any authority for interfering with the ditch beyond the limits of the city.

The basis of authority for the action of the city in the premises, is made to rest upon certain provisions of the city charter, and certain ordinances, which are set out as exhibits in the testimony, and the following, among other of the enumerated powers conferred by the Legislature upon the city, in said charter, is relied upon, viz: "To make regulations to secure the general health of the inhabitants, to declare what shall be a nuisance, and to prevent and remove the same."

The proper construction of this language is, that the city is clothed with authority to declare by general ordinance what shall constitute a nuisance. That is to say, the city may by such ordinance define, classify and enact what things, or classes of things, and under what conditions and circumstances, such specified things are to constitute and be deemed nuisances. For instance, the city might under such authority declare by ordinance that slaughter houses within the limits of the city, carcasses of dead animals left lying within the city, goods, boxes and the like, piled up or remaining for a certain length

of time on the sidewalks, or other things injurious to health, or causing obstruction or danger to the public in the use of the streets and sidewalks, should be deemed nuisances; not that the city council may, by a mere resolution or motion declare any particular thing a nuisance which has not theretofore been pronounced to be such by law, or so adjudged by judicial determination. (*Everett* v. *Council Bluffs*, 40 Iowa, 66; *Yates* v. *Milwaukee*, 10 Wall., 497.) No law or ordinance, under which the city council assumed to act in respect to this ditch, has been cited which defines nuisances, or within the meaning of which such ditch is comprehended.

Nor would it be sufficient if it could be said that the ditch, as an obstruction of the streets, was a public nuisance at common law, for in such case it could be proceeded against only by indictment, or by civil proceeding instituted on behalf of the public by its proper officers. Wood on Law of Nuisances, Sec. 729, and cases cited; 2 Dillon Municipal Corporations, Sec. 659.

It is only certain kinds of nuisances that may be removed or abated summarily by the acts of individuals or by the public, such as those which affect the health, or interfere with the safety of property or person, or are tangible obstructions to streets and highways under circumstances presenting an emergency; such clear cases of nuisances *per se*, are well understood, and need not be further noticed here, to distinguish them from the case before us. If it were admitted that this ditch, by reason of its obstruction to the use of the public streets, at the time of the acts complained of, was a nuisance, it must also be admitted that it was not a nuisance *per se*. It was constructed for a necessary, useful and lawful purpose, was used for such purpose, and therefore in its nature was not a nuisance, as a matter of law. Nor as a matter of fact was it a nuisance while it was no hurt, detriment or offense to the public, or to any private citizen. If, then, it has become a nuisance, it is by reason of a change of circumstances brought about neither by the ditch itself, nor its use. Indeed, the sole matter complained of to warrant its being regarded as a nuisance, is the absence of bridges at street crossings. The town has become populous; its growth has extended beyond the ditch and along its line for a great distance; streets laid out across its course

have come to be traveled so much, that without bridges, the ditch, as appears by the testimony, has become inconvenient, detrimental, and an obstruction to the full, safe and lawful use of such streets as highways by the public. To this extent, and from these causes outside the ditch and its use *per se,* has the ditch come to be a public nuisance, if, as a matter of fact, it is such. But whether it is such or not, is a fact which must first be ascertained by judicial determination before it can be lawfully abated, either by the public or by a private person.

As we have already said, there are certain kinds of nuisances which may be summarily removed or abated, either by the public authorities or by private individuals, but we are attempting here only to declare the law applicable to cases of the nature and character of the one before us.

In the case of *Griffith* v. *McCullum,* 46 Barb., 561, the Supreme Court of New York, after considering what constitutes a nuisance, public or private, and the remedies therefor, summarizes the law touching the same, as follows:

" 1st. That every encroachment upon a highway is not a nuisance.   *   *

" 2d. That that which is exclusively a common or public nuisance, cannot lawfully be abated by the private act of individuals; the remedy is by indictment, or criminal prosecution, unless some other remedy has been provided by statute.

" 3d. A private nuisance may be abated by the party aggrieved.

" 4th. A nuisance may be a public and a private nuisance. In such a case the public may proceed by indictment to abate it, and punish its author; or those individuals to whom it is a private nuisance, by reason of its being especially inconvenient and annoying to them, or that they are in some particular way incommoded thereby, may, of their own act, abate it.

" 5th. In the case of a private nuisance, the aggrieved party has an election of remedies; he may remove the nuisance, or he may have his action for the private damages sustained by him; he cannot have both remedies."

Besides the remedy by indictment, a civil action will lie to prevent or abate a public nuisance, on behalf of the public, by its proper officers. *Attorney General* v. *M. & E. R. R.,* 4 C. E. Green Eq., 387; *State* v. *Berdotte,* 73 Ind., 186; *Taylor* v. *Arm-*

*strong,* 24 Ark., 102; *Metropolitan City Ry.* v. *Chicago,* 96 Ill., 620; Wood's Law of Nuisances, Sec. 729, and cases cited.

Almost every case involving the question of a nuisance in the use of property is to be determined in view of its own circumstances, and as a general rule, the relative rights of the parties control, the question being whether or not the use of the property in the manner complained of is reasonable, and in accordance with such relative rights. *Wood's Law of Nuisances,* Sec. 12.

" As to what constitutes a nuisance is a question for the Court, and not the jury to determine; whether the results of a given business are so common as to amount to a public nuisance is a question for the jury." *Ibid,* Sec. 22.

And the same author states the rule in such cases to be that " the question is not whether an act has been declared to be, but does it come within the idea of a nuisance; if so, it is one, though never held so before; if not, it is not one, though held so a thousand times before." *Ibid,* Sec. 27.

Whether a particular use that is not a nuisance *per se,* is an unreasonable use and a nuisance, is a question of fact, to be judged of from the circumstances of each case by the jury. *Ibid,* Sec. 251, and cases cited.

In treating upon the powers of municipal authorities relating to nuisances, Mr. Wood, in his work referred to, says in respect to such things as are not nuisances *per se,* that they must be lawfully ascertained to be such; that the municipal authorities cannot arbitrarily declare a thing a nuisance, or destroy valuable property which was lawfully erected or created, without such lawful ascertainment; that even if power therefor has been expressly conferred by the Legislature, it is inoperative and void, unless the thing is in fact a nuisance, or was created or erected after the passage of the ordinance, and in defiance of it; and except in cases of emergency, or when the use is clearly a nuisance, the fact should be first established by judicial adjudication. *Vide,* Sec. 740, and the authorities cited.

In the case of *Yates* v. *The City of Milwaukee,* 10 Wall., 497, the Supreme Court of the United States, per Mr. Justice MILLER, say: "But the mere declaration by the city council of Milwaukee, that a certain structure was an encroachment or

obstruction, did not make it so, nor could such declaration make it a nuisance unless it in fact had that character.

"It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city, at the uncontrolled will of the temporary local authorities." The same doctrine is laid down in the case of *C. R. I. & P. R. R.* v. *Joliet,* 79 Ill., 25-44; *Everett* v. *Council Bluffs,* 48 Iowa, 66, and numerous other authorities.

It is therefore quite clear that the plaintiffs below were entitled to the injunction prayed for in the first instance, restraining the city from interference with the use of property which had not been lawfully ascertained and declared to be a nuisance. Upon the record, however, presenting the testimony taken upon the hearing, we are to determine whether the Court below was warranted in decreeing the injunction perpetual upon the facts established by said testimony.

The fact that the construction of the ditch was begun in the fall of 1864, and completed in the spring or summer of 1865, by a company duly incorporated under and by virtue of the general incorporation laws of the Territory of Colorado, is fairly established. The only question of error, based upon objection to evidence admitted, which is specifically presented for our consideration, relates to the certificate of incorporation of this ditch company. The admission of this certificate, as evidence, is objected to, and the validity of the corporation, and its rights and the rights of its lessees, the defendants in error, are denied, on the ground that the certificate omits to specify what stream the water of the ditch is to be taken from, the terminal points of the ditch, and other specifications which, by the statute, the certificate is directed to contain.

That the corporate existence and validity of the acts of a *de facto* corporation whose user is established, cannot be attacked collaterally upon the ground of an irregularity or omission of this nature in its certificate of incorporation, has been decid-

ed by this Court in the case of *Humphreys* v. *Mooney*, 5 Col., 282, for the reasons and upon the authorities therein cited.

The ditch, then, must be held to have been lawfully constructed. It is shown to be six or seven miles long; that it receives its water out of the Platte river at a point on the stream four or five miles above the city; that ever since its completition in 1865, the water flowing through it has been used to irrigate several thousand acres of farming lands beyond the city limits, and for grinding wheat in the mills of defendants in error, situated within the limits of the original town site of Denver. That which is complained of, on the part of the city, to be a nuisance, does not arise out of either the nature of the ditch itself or the manner of its use by the defendants in error. The reasonableness of the use is not questioned, although the absolute necessity of such use as a motive power for the mills is denied by the plaintiff in error. Admitting, then, that the testimony shows that by reason of the increase in travel and traffic upon the streets crossing the ditch, consequent upon the growth of the city, the ditch is such an obstruction to the use of the streets as to be properly deemed a highway nuisance, we may also say that its character as a nuisance is not by such testimony established to exist in any other respect than as such obstruction to certain streets; and further, such character consists solely in the absence of bridges at the crossings, and is wholly contingent upon this circumstance.

The removal of the nuisance, therefore, without the destruction of the property in question or interference with its use, as heretofore enjoyed by defendants in error, can be effected by bridging the ditch properly at the street crossings.

This narrows the controversy down to the real question involved in this branch of the case, viz: which party is liable for the construction of these bridges, the defendants in error or the city? If the former, then the decree of the Court below should be modified accordingly; if the latter, then the decree need not be disturbed.

The question therefore to be determined is one dependent upon the relative rights of the parties to this action respectively.

As to all the streets intersected by the ditch outside of the original limits of the city known as the Congressional grant,

the testimony shows that the ditch was constructed seven or eight years before these streets were laid out. The plat of Hunt's addition, which we understand to be the oldest of the additions to the city on the line of this ditch, was filed in 1872. The ditch in question was marked on the map or plat of this addition as filed, and the right of way for said ditch had been previously acquired by the ditch company of the owners of the lands embraced in this addition.

Under this state of facts, we think it clear that the owner of this addition dedicated the streets he had laid out, intersecting this ditch, subject to the pre-existing right of way of the said ditch, and it seems equally clear that the city should be held to have accepted such dedication and acquired control of these streets subject to the same pre-existing rights of the proprietors of the ditch. The city having thus acquired the fee and control of these streets, in trust for the public, under the conditions of the grant and dedication, must render them passable and keep in repair as the public necessity and convenience require, without interfering with the rightful and accustomed use of said ditch; that is to say, the use of said ditch to the same extent and for the like purposes enjoyed thereby prior to the grant and dedication of the streets to the city, as aforesaid.

With respect to the streets intersected by the ditch within the Congressional grant, a different state of facts exists, and a more difficult question is presented.

The company for the construction of this ditch was incorporated October 8th, 1864. The construction was commenced thereafter, that same year, and completed the spring or summer following. The fact is conceded that long prior to the date of the incorporation of said company, and the construction of the ditch, the streets of that portion of the city included in the Congressional grant and intersected by the ditch, to wit: Champa, Curtis, Lawrence, Larimer, Holladay, Wazee, Wyncoop, Eighth and Ninth streets, were laid out and mapped the same as they now exist, and the map filed as of record in the proper office of the county records. At this time, the title to the lands included in the city of Denver, as laid out and mapped as aforesaid, was in the United States, the lands being a part of the public domain under the control of, and subject to disposal by the general government.

On the 28th of May, 1864, an act of Congress, entitled "An act for the relief of the citizens of Denver, in the Territory of Colorado," was approved; which act authorized the entry of the tract known as the "Congressional grant," by the Probate Judge of the county including such tract, in trust for the inhabitants, as a town site. This entry was made by such Probate Judge, and a certificate of the entry thereof was issued on May 6th, 1865, and a patent for the same was thereafter issued June 8th, 1868.

The city of Denver was incorporated by act of the Legislature of the Territory of Colorado, at the first session of such Legislature in 1861, and by said act the municipal authorities were authorized to have and exercise general control of the streets, alleys and highways within the city.

Upon this state of facts, it is contended on behalf of the city, that at the time of the construction of the ditch, the city, by reason of the prior laying out of the streets, and the authority conferred by the charter or act of incorporation mentioned, acquired and still possess the right to require the proprietors of the ditch to bridge the same at the street crossings when necessary, and that the construction and use of said ditch has always been subject to such right of the city.

On the other hand, it is contended on behalf of the defendants in error, that, chiefly for the reason that at the date of incorporation of the ditch company and the construction of said ditch, the title to the land in question was in the United States and not in the city, no prior valid right accrued to the city to exact of the ditch proprietors the requirements in controversy.

In further support of the contention on behalf of the city, the point is made in argument, that the title of the city to the lands acquired by the entry of May 8th, 1865, relates back to the date of the act of May 28th, 1864, authorizing the entry. We cannot assent to the correctness of this proposition. This last mentioned act is not in the nature of a grant, but is simply a provision to enable the city to acquire title to land for a town site, if it should thereafter elect to avail itself of the provisions of the act, and it is not perceived upon what principle the title subsequently acquired by the entry could relate back to the act mentioned, any more than the title acquired by en-

try of public lands by a private citizen, can relate back to the date of the law of Congress which authorized such entry; and in the case of such entries under the acts of Congress for the disposal of the public domain, it is not questioned that the title accrues to the party making the entry at the date of such entry, and not before. The government itself does not really part with the title until the issue of the patent therefor, but upon the issue of such patent, the title conveyed by the grant is held to relate back to the date of the entry as evidenced by the certificate thereof.

Can it be said that the city acquired such a right to the streets under and by virtue of its charter in 1861 as would enable it to assert such right as superior to the rights subsequently acquired by the ditch company? We think not. The act of Congress, creating the Territory of Colorado, usually called the organic act, approved February 28, 1861, limited the legislative power of the Territory to " all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act;" and in the same section declares that "no law shall be passed interfering with the primary disposal of the soil;" and also prohibits the passing of any law " impairing the rights of private property." While the conferring upon the municipal authorities of a town the power to control generally the streets, looking to their necessary and proper use as such by the public, is certainly a rightful subject of legislation, yet it is to be borne in mind that ditches and artificial streams of water for irrigating, milling, and other like purposes, were of such prime necessity in regions like Colorado, that the legislation of Congress, as well as of the Territory, has frequently declared the paramount value of the rights springing from such necessity, and the Courts have been very careful to guard such rights.

In the case of *Broder* v. *Water Co.*, 11 Otto, 274, which was an action to have a certain irrigating ditch or canal declared a nuisance and abated as such, the act of Congress of July 26, 1866, was involved. The ninth section of this act declares that " whenever, by priority of possession, *rights* to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions

of Courts, the possessors and owners of such vested rights shall be maintained and protected in the same, and the right of way for the construction of ditches and canals, for the purposes aforesaid, is hereby acknowledged and confirmed."

The Supreme Court of the United States, in construing and applying this provision of the act to the case before them, say: " It is the established doctrine of this Court that rights of miners, who had taken possession of the mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations, and for purposes of agricultural irrigation in the region where such artificial use of the water was an absolute necessity, are rights which the government had, by its conduct, recognized and encouraged, and was bound to protect, before the passage of the act of 1866. We are of opinion that the section of the act which we have quoted was rather a voluntary *recognition of a pre-existing right of possession*, constituting a valid claim to its continued use, than the establishment of a new one." Much other authority, in the decisions of Courts, and in legislative acts, both of Congress and of our own Territory, might be cited upon this point. We are forced to conclude that the authority conferred by the act of 1861, incorporating the City of Denver, in respect to the control of the streets by the city, cannot be extended to invalidate the acquisition thereafter by the ditch proprietors of a right of way through lands which were then a part of the public domain, and prior to the acquisition of title thereto by the city, although streets had been previously laid out thereon and traveled.

Bearing upon the question of the relative rights and liabilities of the parties under discussion, it is not unimportant to notice that from the testimony it appears that the ditch proprietors and those using the water therein, have never conceded the right of the city to require them to bridge the ditch, but have always resisted such demand; and that on the other hand, the city, from time to time, has bridged the streets mostly traveled where crossed by the ditch or raceway below the mills; that some of these bridges were built by the city many years ago, and have been maintained and kept in repair by the city ever since, thus apparently acquiescing in, if not acknowledging, the rights claimed by the defendants in error.

In consequence of the public interests involved, as well as the great value of the property that would be affected by the destruction of the ditch or the diversion of the water from the use of defendants in error, we have given this case that careful consideration which the respective rights and interests involved therein demands, and upon such consideration of the whole case, we are convinced that the city is without right to require the defendants in error to bridge the ditch, as demanded of them, or to interfere with the flow and use of the water in said ditch, to the extent and for the purposes heretofore used and enjoyed, but that the duty and obligation to construct such bridges, whenever and wherever the public necessity and convenience require, and to maintain and keep the same in repair, devolves upon the city. We are not to be understood as holding that the said ditch or the use thereof may not at some future time, by reason of changed circumstances, become a nuisance and liable to be abated as such; what we decide at present is, that, for the reasons stated herein, we perceive no error in the judgment and decree of the Court below, and the same will be affirmed accordingly.

*Decree affirmed.*

*Jno. C. Stallcup, City Attorney,* for plaintiff in error.

*Markham, Patterson & Thomas,* for defendants in error.