The Western and Atlantic Railroad Co. vs. Young.

___

THE WESTERN AND ATLANTIC RAILROAD CO. *vs.* YOUNG.

1. Interest at the legal rate cannot be added by the jury in their discretion, to discretionary damages awarded by them for a personal injury. Only special damages computable upon direct or indirect evidence of actual values can be thus increased.
2. Due care for its own safety in a child nine years of age, is such care as its capacity, mental and physical, fits it for exercising in the actual circumstances of the occasion and situation. Neither the average child of its own age, nor the prudent man, is a standard by which to measure its diligence with legal exactness. Such care as the capacity of the particular child enables it to use naturally and reasonably, is what the law requires.
3. It is negligence as matter of law for railway companies not to use the precautions for safety at public crossings definitely prescribed by statute or valid municipal ordinance. The existence of an ordinance, however, is matter of fact to be referred to the jury; the court cannot notice it judicially. Such an ordinance, regulating speed of trains and requiring flagmen or watchmen to be kept at crowded crossings, may be passed and enforced by a city under the general grant of police powers usually found in municipal charters. No unreasonable ordinance can be valid.
4. For a personal injury to a child nine years of age, including deprivation of a member, the law furnishes no measure of damages other than the enlightened conscience of impartial jurors,

guided by all the facts and circumstances of the particular case. Amongst the results of the injury to be considered, are pain and suffering, disfigurement and mutilation of the person, and impaired capacity to pursue the ordinary avocations of life at and after attainment of majority.

November 9, 1888.

Damages. Interest. Diligence. Negligence. Municipal corporations. Evidence. ˙ Railroads. Before Judge VAN EPPS. City court of Atlanta. June term, 1888.

Willie Young, by his mother as next friend, sued the railroad company for damages for personal injuries, claiming in his declaration that the facts set out therein constituted aggravating circumstances; and so his suit was for punitive as well as actual damages. The defendant pleaded the general issue; and also that plaintiff's injuries were caused by his own negligence, in recklessly attempting to cross the track while cars were moving thereon, which cars were in full open view and could be seen by plaintiff, and if he had exercised ordinary care he would not have been injured.

On the trial, the evidence for the plaintiff was, in brief, as follows: Willie Young lost an arm Saturday evening, May 28, 1887. He went to school, and also carried bundles for a dressmaker, and had been carrying bundles that afternoon. This business carried him into the vicinity of the Loyd street crossing of eight railroad tracks, at the east or southeast end of the passenger depot in Atlanta. Was in a hurry and wanted to get back, and to pass the railroad at this crossing was as near and as convenient a way as any other. Was crossing the railroad as carefully as he could, watching the cars up to his right towards Pryor street, and did not see the cars coming down on his

left, by which he was struck, until one Hollingsworth (one of his witnesses) called to him that they were coming. At the time he was struck, he was on the first track on the south side of the depot next to the stores. Was ten years old, and stood well in school. The day was bright. There was nobody with him, and there were very few people around the place, and nothing to prevent his seeing the cars which struck him that he remembered. He did not stop at the crossing, nor did any one order him away. When struck, was crossing right along the sidewalk. Did not undertake to run around the front of the cars. Did not see them until Hollingsworth called to him, but they were running so fast he could not get out of the way. It was not dark. Did not start to cross, and when called to, try to go back. Did try to turn to get out the way, but the cars were coming so fast, could not do so. Was running from the cars; went the same way they were going. When called to, looked around and saw the cars, and they caught him before he could take another step. Was accustomed to cross the railroad by a bridge or culvert; but was in a hurry to get back that evening, as he had more bundles to carry, and that was the nearest way. Was looking out as carefully as anybody could, and was prevented from seeing these cars as they came running back by watching the cars up the other way and keeping out of their way. These were freight cars, with an engine at their rear pushing them. When he first came on the crossing, he looked up the way from which the cars which struck him came, as carefully as anybody could, and did not see them; then looked up the other way as he was crossing, and then was called to. Had already reached the tracks on the north or northeast side of the depot, when he looked towards his left to see if any trains

were coming from that direction.    The cars that struck. him came from that direction.    One could see three or four blocks looking that way.    He looked up there, saw no cars, and then started to cross and was caught.

The surgeon who attended Young testified as to the extent of the injuries, the suffering, etc.    From the testimony of Hollingsworth, who was present when Young was run over, appeared the following among other things: Johnson was car-coupler or brakeman on the train that inflicted the injury.    He was riding on a car up one of the tracks by the depot.    Between the depot and the stores are three tracks; from the opposite side of the depot to the stores are eight tracks.    Southeast of one end of the depot was a switch.    Of the three tracks between the depot and the stores, one next the depot is called number one, and the one next the stores number three.    The train to which Johnson belonged had been on track number three and pulled out some cars and shoved one on track number one, and on top of this one witness saw Johnson and went to speak to him.    The engine was going back towards the southeast with the other cars; and while Johnson and witness were standing talking, Young passed by.    Happening to look round, witness saw the cars (two or three in number) coming back, and saw Young just approaching the track.    He did not see these cars coming; his attention seemed to be attracted towards the depot.    Witness called to him; he looked and saw the cars, and started to run out of the way, made two or three steps, but the cars approached him so fast he had not time to get out of the way.    They knocked him down and dragged him about a car's length, pushing him a little distance before they ran over him.    They were coming back on track number three, moving probably six miles per hour.    The engine was not attached

to them; it was down below the crossing. No one was on top of the cars. Johnson finally stopped them, after they struck Young, by climbing on top and putting on the brakes. The crossing watchman, at that time, was on the east side of the street over next to the Georgia railroad depot, sitting down talking to some gentlemen in the shade of trees. If any one was looking out for the cars, he never called or said anything to the boy that witness heard. No one was in front of these cars as they came across the street.

The plaintiff introduced mortuary and annuity tables. Also a city ordinance, providing that it shall be the duty of railroad companies using the tracks across certain streets (Loyd among others) to place and keep a sufficient number of flagmen at the crossings, whose duties shall be to prevent all railroad trains passing from moving at a rate of speed greater than four miles per hour, and to protect the lives of persons passing along the streets at the points mentioned. It further provides for a punishment of railroad engineers or firemen who run across the streets at a speed greater than that named.

A number of witnesses were introduced by the defendant, and their evidence tended to show the following among other things: It is contrary to rules to shove cars across Loyd street at a speed greater than four miles per hour. About a quarter of an hour before he was hurt, Young was playing with another boy on the sidewalk above the depot. He stopped playing, walked down and stood a while on the crossing; then after a while he came and jumped over on the track that runs beside the platform. He stood there a few minutes, and the engine and cars came back again, moving at two or three miles per hour. Defendant's witness called to him to get off the track. He turned and looked at

witness about a minute, when the cars struck him. Before he was hurt, there was a brakeman standing there, and the boy came and looked at him a while. There was nothing to prevent Young's going safely over the crossing, or his seeing the cars that struck him, if he had been looking towards them. One could see a long distance up the railroad there. Thompson, the crossing watchman, was appointed by the police commissioners, to whom his name was furnished by the Air-line road. His duties required him to stay at the Loyd street crossing, all over it and around it. He had ordered Young and another little boy away from the crossing a little while before he was hurt, and they went in different directions. It was on a clear day, about five o'clock in the afternoon, and there was nothing that would have prevented Young's seeing the cars as they came. There was an ordinance requiring the watchman to arrest an engineer going across a crossing faster than four miles an hour. The railroad paid this watchman. The police commissioners gave him police powers. Johnson, the car-coupler, first saw Young when Hollingsworth called to him; then signalled to the engine (the car being in about two feet of Young), and the engine was stopped within ten feet. The engine was up against the cars, as far as Johnson could see them, when he gave the signal to stop. As soon as the engine was reversed, the cars were not attached to it. Coleman was coupling between the car and the engine, and was standing between the tender and the engine. Johnson called to him to stop; he called to the engineer, and he reversed the engine; and the pin flew out of the bumper. If it had not, it would have held the two cars dead still. This very often happens. They did not cut the cars loose.—Other evidence tended to show that the company's servants were properly performing their

duties. Two city ordinances were introduced; one requiring flagmen to flag trains passing Whitehall street, giving them power to arrest persons when they rushed ahead of trains, and fixing a penalty for such conduct; the other forbidding minors to play and loiter about railroad tracks and shops, and fixing a penalty for refusing to leave on being ordered away by a policeman.

The jury found for the plaintiff $10,000. The defendant moved for a new trial on the following grounds:

(1)–(3) The verdict is contrary to the evidence, and to justice and equity.

(4)–(5) The verdict is grossly excessive, and must have been the result of prejudice, bias or undue influence.

(6)–(7) The verdict shows that the jury must have disregarded the evidence showing contributory negligence of plaintiff, as well as the evidence showing that he could, by the use of ordinary care, have avoided the injury.

(8) The court erred in permitting plaintiff's counsel, over objection, to examine witness Hollingsworth as to "kicking" or shoving cars, the name of the engine, the road Johnson was working for, the engineer of the switching engine, and the railroad doing the switching, and other matters; because this witness had already been examined in chief and cross-examined, and the matters inquired of in this examination were not in rebuttal.

(9) The court erred in the following ruling: Defendant's counsel was proposing to examine witness Johnson as to the suddenness with which plaintiff got on the track, and as to the time the watchman had to give notice; and immediately after the witness had stated, "If he had been in the middle of the street on the crossing, he could have warned him before the cars came between

them", defendant's counsel asked, "Could he have done so from the suddenness with which he got on?" On objection, this question was excluded.

(10) The court erred in the following ruling: Defendant's counsel asked witness Johnson, "Was any notice necessary to be given at that point and at that time to a boy in possession of his sight and faculties, to notify and warn him of the approach of a train, a clear, bright evening like that was?" This was objected to because leading, and because the witness was not a judge of whether or not it would be necessary, etc. The court held that the witness might be questioned as to what was usual in giving notice of the approach of cars to persons attempting to cross the tracks, but that it was not competent for him to testify what was necessary.

(11) The court erred in admitting in evidence, over objection, the city ordinance on the subject of Loyd and other street crossings, the speed of trains and the watchman. What objection was made does not appear.

(12) The court refused to charge thus: "What was or what was not ordinary care, or what was or what was not negligence, at the time of the injury, are questions of fact to be determined by the jury. The measure of care which the law provides that the plaintiff in this case should have exercised at the time of the injury was such ordinary care as could have avoided the consequences to himself of defendant's negligence, if defendant was negligent. If plaintiff could have exercised such care, and did not do it, he is not entitled to recover of defendant anything, even if defendant was negligent. It is for the jury to say whether he exercised this measure of care." This statement set up the proper measure of care which the law required should be exercised by the plaintiff, but the court, in his charge, set up a different measure.

(13), (14), (16), (17), (18), (19), (20), (22), (23), (27), (29), (30), (32), (34), (39), (41) The verdict was contrary to certain specified charges of the court.

(15) The court charged as follows: "The court instructs the jury that ordinary care depends upon the circumstances of each particular case, and is such care as a person of ordinary prudence and skill would usually exercise under the same or similar circumstances." This charge was calculated to mislead the jury, the plaintiff being a minor, and is not law; and the court should have used the word "man" instead of "person."

(21) The court charged as follows: "A person who trespasses on a railroad track by going upon it at a place where he has no right to be, is bound to anticipate negligence upon the part of the servants of the railroad company. A person who goes upon a railroad track at the crossing of a public street at a place where he has a right to be, may legally assume that the servants of the railroad company will not be negligent with reference to him and his safety, and is bound to use only ordinary care and diligence to avoid injury after the negligence of the railroad company begins to operate and its peril impends over him so as to be discovered by the use of such care." The charge was calculated to mislead the jury, and is not law; in effect, it limited the diligence of plaintiff to the last of the eight tracks he crossed; and it was otherwise illegal and contradictory to other parts of the charge.

(24) The court charged as follows: "Ordinary diligence, as already remarked in another connection, is that degree of care and attention which ordinarily reasonable and prudent persons would use under the same or similar circumstances. If the plaintiff was a child of tender years, it would be that degree of care and attention which a child of average powers and capacity,

of the same age, would use under the same or similar circumstances." This is not law; the court should have used the word "men" instead of "persons"; the law does not make one rule of diligence for men and another for children; the charge misled the jury as to the amount of diligence required; and it was otherwise illegal.

(25) The court charged as follows: "It is the peculiar province of the jury to pass upon the question of negligence, and to determine, from the evidence and in view of all the facts and circumstances of this case, whether the plaintiff or defendant's servants or both were negligent or otherwise. When the law is silent touching a specific act done or left undone, the question of negligence is always a question of fact for the jury to determine. The omission, however, of specific acts of diligence, which are prescribed by the statute or by a valid municipal ordinance, is negligence as matter of law. We have a statute by which it is made the duty of a railroad company, whenever its trains approach a crossing in a city or village, to give a signal by ringing the bell and continue to ring it, and at the same time to check the speed so as to be able to stop the train if anything should be on the crossing. This law in respect to checking a train in passing a crossing applies to crossings on a street in a city, and the engineer must continue to check until the crossing is passed. This law contemplates that the engine and engineer in control of it shall remain connected with a train of cars proceeding across a street crossing, and that the engineer shall ring and keep ringing the bell as he advances, as an admonition to persons on the street, and check and keep checking, so as to be able to stop his train if any person is on the crossing in a situation of danger." This charge did not apply to the facts of this case, and

was calculated to mislead the jury, in that the court took from the jury and decided what was negligence as matter of law; the laws and ordinances did not apply to this case; and the charge was otherwise illegal.

(26) The court charged as follows: "If the engineer, in approaching the crossing, pushing cars in front of his engine, imparts momentum to the cars in order to 'kick' them, or to cause them to roll across the crossing, and intentionally and voluntarily disconnects his engine from such cars and reverses it and proceeds in an opposite direction from that in which the cars are left going, although ringing the bell as he goes away, but under circumstances where he could not, in the nature of the case, check and keep checking the train till the crossing is passed, so as to be able to stop the train if any person should be on the crossing, such an act would be negligence as matter of law, and such negligence would render the company liable to any person injured by the rolling of such cars, provided such person could not, by the exercise of ordinary care and diligence, have avoided the consequences of such negligence. When such injury occurs, the *onus* is on the company to prove such fault on the part of the injured person." Assigned as error for the same reasons as stated in the preceding ground.

(28) The court charged as follows: "So, if a city ordinance prescribes a duty, the failure to perform the duty enjoined is negligence as a matter of law An ordinance of the city of Atlanta makes it penal for railroad engineers or firemen to run or drive an engine across Loyd street and other streets mentioned in the ordinance, in said city, at a greater rate of speed than four miles per hour. If the defendant's engineer drove or ran cars in front of his engine across Loyd street faster than four miles an hour at the time and place in

question here, such an act was negligence as matter of law, and if the plaintiff was injured thereby, the defendant would be liable for the actual damages sustained by him as a result of such negligence, provided he could not, by the exercise of ordinary care, have avoided injury." The charge is not law; it decided, as matter of law, what would be negligence; and it did not apply to this case; the ordinance was penal, applying not to the company but its employés, and it was illegal if sought to be applied to this case and to the company.

(31) The court charged as follows: "So also this ordinance prescribes as a duty that railroad companies using the tracks across Loyd street or other named streets, shall place and keep a sufficient number of flagmen at said crossings, whose duty it shall be to prevent all railroad trains from going at a greater rate of speed than four miles per hour, and further, to protect the lives of persons passing along the streets at the points mentioned. If the company failed to place and keep a sufficient number of flagmen for this purpose, or if such flagmen failed to use ordinary care and diligence to protect the lives of persons passing along said streets, such omission of the duty prescribed by this ordinance would be negligence as matter of law." This charge is not law, and did not apply to this case; the railroad company could not be required to furnish flagmen, which the evidence showed were city policemen, and pay them and keep them at crossings with their money taken for public use, as is done by such ordinances, and said ordinances requiring it to be done are null and void and place no sort of duty on defendant; under the evidence, this was not a flagman of defendant and not under its control; the ordinance and this charge upon it are illegal; and the court took from the jury and decided as matter of law what was negligence.

(33) The court charged as follows : " If the defendant, by agreement with the Georgia railroad or other roads, kept and placed flagmen at the crossing on the north end of the depot, and the Georgia railroad and others, under the agreement, placed and kept them at the crossing at the south end, the flagmen at the Loyd street crossing and the other crossings to the south would be as much placed and kept there by the defendant as if the defendant had sole control of them, and the defendant would not have independently to place others there of their own appointing if those put there were sufficient for the purpose." Assigned as error for the same reasons as stated in the preceding ground.

(35) The court charged as follows : " To sum up briefly : if you believe the defendant is not guilty of negligence as a matter of law, by violating the provisions either of the statute or the ordinances to which I have alluded, you would determine for yourselves whether the defendant was guilty of negligence as a matter of fact, in view of all the facts and circumstances disclosed on the trial and of the law given you in charge at the outset." This charge was calculated to mislead the jury by calling to their attention two kinds of negligence ; and the charge upon negligence as matter of law, is not law for the reasons hereinbefore assigned.

(36) The court charged as follows : "As to the measure of damages, the *onus* of proof is upon the plaintiff to establish the amount of his damage. As the trial judge cannot know in advance what view the jury may take of the evidence adduced, or whether it will find the issues with plaintiff or defendant, it is my duty to give you certain instructions as to the law governing the measure of damages in this class of cases. If you find for the plaintiff, these rules will be of service to you ; if you find for the defendant, you will have no occasion

to consider or apply them. The plaintiff claims, in the first place, that his capacity to labor and earn money during his future life has been permanently destroyed, as the result of defendant's negligence; and the law has no procrustean rule for the ascertainment of damages of this sort. Health, age, heredity, habits, avocation, money made by one's labor, prospect of increased earnings from experience or skill acquired, or diminished capacity as the result of growing years and infirmity, prospect of obtaining steady and remunerative employment, and the like; all these circumstances, so far as applicable to the facts of this case, are proper to be considered by the jury. It is not denied in this case that the plaintiff was too young to have adopted an avocation in life, or to begin to earn money by his labor. And it is conceded that whatever he might earn hereafter and until he attains his majority, that is, twenty-one years old, belongs to his parents, and that nothing can be allowed him for diminished capacity to labor this side of twenty-one years of age. Certain tables have been introduced, illustrating the number of years a child of the plaintiff's age will probably live, according to the doctrine of expectancy of years as compiled in the business of life insurance. These tables are not binding as such upon the jury, but may be considered by you, along with the other evidence in this case, and their conclusions tested in the light of common observation and experience, and their results modified by such evidence, if any, as this case may show to affect this particular plaintiff. Damages are given as compensation for injury done, and generally this is the measure where the injury is of a character capable of being estimated in money. If this plaintiff has been permanently injured as the result of the defendant's negligence, and you have no *data* by which you may estimate the probable

future earnings of the plaintiff after he attains his majority, you would be authorized to award him such sum as, in your opinion, would fairly and reasonably compensate him for his pecuniary loss, if any, having in view his degree of intelligence and his opportunities to equip himself for the race of life according to his status or present condition in life, and in view of the pursuits he may yet apply himself to and might have applied himself to if he had not been injured." This charge is not law; it instructed the jury that they might, without proof, find pecuniary damages for plaintiff's pecuniary loss; and it is otherwise illegal.

(37) The court charged that it was not denied that plaintiff was too young to have adopted an avocation or to begin to earn money by his labor. This was error, because there was no evidence and no admission to authorize such charge, but the contrary was shown; defendant was not required to make any denial of it, and the absence of such denial did not authorize the court to assume that such facts existed, there being no *onus* on defendant in the premises.

(38) The court charged as follows: "I am of the opinion, and so charge you, that the law is that, in a case where the injured party is too young to have selected an avocation, or to begin to illustrate, by his labor, his wage earning capacity, the matter of the amount of damages for a permanent injury rests in the sound discretion of the jury, to be exercised in the light of their common observation and experience, and aiming to compensate the plaintiff for the injury actually sustained in this respect." This charge is not law; such damages are not the kind and character where the law leaves the same to be determined by the enlightened conscience of impartial jurors; this charge instructed the jury that they might, in the

absence of evidence, find pecuniary damages; the *onus* was on plaintiff to establish the amount of his damages by evidence, and not by the sound discretion of the jury; the instruction was in conflict with another portion of the charge; and it was otherwise illegal and too speculative.

(40) The court charged as follows: "The plaintiff also claims damages for pain, past, present and future, which he says he has suffered and will continue to suffer as the result of the injury, and for an alleged deformity or impairment of his physical symmetry. As to cuts, wounds, bruises and the like, and the pain and suffering resulting therefrom, or impairment of physical proportion and symmetry resulting from the loss of a member, the law has no standard by which the amount of damages of this sort may be ascertained. Damages of this kind are peculiarly in the discretion of the jury. The law refers the matter of amount, if any, to be awarded, as to this item, to the enlightened consciences of impartial jurors, whose aim it is to be fair and reasonable, just and not oppressive. If you find for the plaintiff, you might, if you see proper to do so, award further damages in the nature of interest on the sum found, that is to say, damages for the detention of the sum awarded, computed at seven per cent. per annum, from the date of the injury to the present time. If you allow damages for a detention of the sum found, in the nature of interest, you will add it to the other sum and bring in your verdict for one single sum." This charge is not law; interest cannot be allowed upon unliquidated damages; the tables upon which the court had charged are based partly upon interest already; interest cannot be allowed on future pain; and to allow interest upon such a statement of damages as the proof shows, is not legal.

The motion was overruled, and the defendant ex cepted.

JULIUS L. BROWN, for plaintiff in error.

HOKE & BURTON SMITH, *contra*

BLECKLEY, Chief Justice.

The plaintiff below, a boy nine years of age, obtained a verdict for $10,000, for personal injuries received on a public street crossing in the city of Atlanta, by reason of being thrown down and run over by the cars of the railway company, his chief injury being the loss of his right arm, which had to be amputated above the elbow. The company moved for a new trial, upon forty grounds, all of which were overruled.

1. The last ground of the motion complains of the charge of the court to the effect that the jury might, in their discretion, award upon discretionary damages, further damages in the nature of interest computed at seven per cent. from the date of the injury to the time of trial. This instruction was error. There is no authority of law for treating the jury as clothed with a double discretion, a discretion to be exercised, first, in fixing the amount of the plaintiff's damages, and then in augmenting that amount by an assessment in the nature of interest for detention of the money, or delay of payment. As long as the principal sum was not only unascertained, but unascertainable save by the enlightened conscience of impartial jurors, the law neither appointed a day of payment nor exacted any tender.

The privilege of tendering by guess, given by statute in section 3056 of the code, is not granted as a resource to shun or stop interest, but to avoid cost. As far back as 1799, we have statutory evidence adverse to the pol-

icy of increasing verdicts on account of interest upon unliquidated demands. Cobb's Dig. 495. It was thought consistent with this statute to increase the damages in trover by the addition of interest on the value of the property from the time of conversion. See *Collier vs. Lyons*, 18 *Ga.* 648, and other cases. So, in *Railroad Co. vs. Garr*, 57 *Ga.* 280, the power of the jury to add interest in computing damages recoverable by a widow for the homicide of her husband, is tacitly recognized. And in *Railroad Co. vs. Sears*, 66 *Ga.* 499, there is apparently a like recognition of the power, whilst the direct adjudication was that it is not obligatory as a duty. To the same effect, perhaps, is *Railroad Co. vs. McCauley*, 68 *Ga.* 818, where the action was for killing a bull. But in all these cases the damages recoverable were special, and had to be proved by evidence applying directly or indirectly to values; whilst in the present case there is no such evidence, and the entire recovery is for damages of a nature incapable of any standard of measurement external to the minds and consciences of the jury. In this respect, though they are not punitive, all claim to punitive damages having been renounced at the trial, they are as indefinite and indeterminate in their elements as are damages of that class; consequently the case of *Ratteree vs. Chapman*, 79 *Ga.* 574, which holds that the jury should not be instructed that they are authorized to add interest in assessing damages, where punitive damages can be allowed, rules this case. In principle, the two cases are one and the same. To add interest to discretionary damages is to multiply uncertainty by certainty, the indefinite by the definite, a mixture of incongruous elements which subjects one of the parties to the burden, and gives the other the benefit of both kinds. If the time of realizing discretionary damages is to be consid-

ered (and doubtless the jury may consider it), it should be left as one of the terms of the general problem of damages, unfixed like all the rest of the terms. The rate of interest as established by law has no relevancy to the matter. Sums ascertainable only by the enlightened conscience of impartial jurors do not bear interest before verdict, either as interest or as damages, with or without discretionary allowance by the jury.

2. The cars which hurt the boy were being switched, in the heart of the city, from the premises of one railroad company to those of another. They were running backwards. The boy was passing along a street which divided the premises of the one company from those of the other, and which crossed eight parallel tracks. He was upon the sidewalk. His diligence in looking out for danger was and is a main point in the merits of the litigation. The court charged (24th ground of the motion) that " ordinary diligence is that degree of care and attention which ordinarily reasonable and prudent persons would use under the same or similar circumstances. If the plaintiff was a child of tender years, it would be that degree of care and attention which a child of average powers and capacity, of the same age, would use under the same or similar circumstances." The objections to this charge, as indicated in the motion, are that the court should have used "men" instead of " persons," and that it was otherwise illegal. We do not go back to the reported cases to see whether the care of " ordinarily reasonable and prudent persons ", is equivalent to the care of "every prudent person," but we suggest that the standard of ordinary care, under our law, is the care of every prudent man, and not of the average or ordinary prudent man or person. In Beach on Contributory Negligence, §9, p. 23, mention is made of the ideal average prudent man, whose conduct theoretically is a

constant, but we prefer to look for a standard to the real man, the prudent man, and to exclude the average altogether from the test. When the class prudent has been reached, every individual of the class ought to be considered prudent, and there is no occasion to invent an average ideal man to represent the class. "A prudent man foreseeth the evil and hideth himself." I have examined the cases cited by Mr. Beach with reference to averaging the class prudent, except Walsh vs. Oregon R. R., 10 Oregon, 250, and in only one of them, Coates vs. Canaan, 51 Vt. 138, do I find average treated directly as an element in defining ordinary care.

But conceding that average may serve as a standard in adults, it will not follow that a like standard should have recognition as to children   Could we assume an ideal constant as to the former, who that knows how precocious are some children and how backward are others, would carry the assumption down to childhood and apply it to children ?/Capacity (which includes personal experience as well as natural gifts) is the main thing. Age is of no significance except as a mark or sign of capacity. Some of the decisions mention age only, but most of them couple capacity with it. As specimens, see Lynch vs. Nurdin, 1 Ad. & El., N. S. 29; Railroad Company vs. Gladman, 15 Wall. 401; Railroad Company vs. Stout, 17 Ib. 657; Munn vs. Reed, 4 Allen, 431; Railway Company vs. Crenshaw, 65 Alabama 566; Byrne vs. Railroad Company, 83 N. Y. 620; Plumley vs. Birch, 124 Mass. 57; Dowd vs. Chicopee, 116 Mass. 93; Lynch vs. Smith, 104 Mass. 52. The study of these and other like cases will lead to two conclusions: first, that no court can hold that childhood and manhood are bound to observe the same degree of diligence; secondly, that while the name ordinary care is frequently applied to the diligence exacted by law of a

child, there is little propriety in doing so; due care is always the better and more accurate description. Certainly extraordinary care, in any proper sense of the term, can never be exacted of young children, and slight diligence would often be due care on their part, when in adults it would be gross negligence. The comparative degrees, extraordinary, ordinary and slight, it seems to us, cannot be fitly applied to children in reference to measures to be observed by them for their own security. If such an application was suggested by *Vickers vs. Atlanta & West Point Railroad,* 64 *Ga.* 306, it was an inadvertence, not in what was said but in what was implied. Due care on the part of this boy might fall far short of that of a prudent man, and yet exceed that of average boys of his own age. According to the evidence as to his standing at school, he was much above the average of his class.

3. As to the charge of the court touching negligence as matter of law, the application of the statute and of the city ordinance, the duty to ring the bell and hold trains in check so as to stop them at street crossings, the duty to comply with the ordinance as to the speed of trains not stopped, and as to keeping watchmen or flagmen at certain crossings, and as to responsibility of the railroad companies for inattention or negligence by such flagmen or watchmen, (in respect to all which, see 25th, 26th, 28th, 31st, 33d, 35th grounds of the motion,) we have little fault to find. On these subjects we merely refer to cases already adjudicated. *Atlanta & West Point Railroad vs. Wyly,* 65 *Ga.* 120; *Central Railroad vs. Smith,* 78 *Ga.* 694; *Georgia Railroad vs. Carr,* 73 *Ga.* 557; *W. & A. R. R. vs. Meigs,* 74 *Ga.* 857; *Central Railroad vs. Russell,* 75 *Ga.* 810. We see no reason to doubt that a city which is the terminus of numerous connecting railways which interchange business within

v 81-27

the corporate limits, may, by virtue of the usual grant of police powers found in municipal charters, not only regulate the speed of trains and moving cars, but prescribe regulations for maintaining the necessary flagmen or watchmen at "street crossings, to secure the safety of the public, and that railroad companies, as matter of legal duty, must comply with such requirements and regulations, if they are reasonable. Of course, nothing unreasonable can lawfully be prescribed by virtue of general police powers, or if prescribed, can be enforced. The mixing up of flagmen or watchmen with the official police of the city is irregular, but seems to us not to vitiate an ordinance on the subject which railroad companies have virtually recognized and assented to, by employing and using as flagmen or watchmen, persons invested with general police powers, in addition to their functions as railroad employés.

We will add that the style of the charge touching the city ordinances, was too absolute and unconditional, in treating them as law, without any reference to the jury of the question of fact as to whether there were such ordinances before them, and perhaps as to whether they were reasonable. The manner of dealing with the subject in the *Central Railroad vs. Smith, supra,* was more satisfactory, save that the ordinance involved in that case was not applicable to the facts.

4. On the measure of damages, see the 4th head-note. We think the court laid down substantially the correct rule in the 38th ground of the motion for a new trial, and in that part of the 40th ground preceding the instruction relating to the discretion of the jury in allowing interest. We regard what is complained of in the 36th ground of the motion as subject to just criticism, and we think it a sound direction to give, that this part of the charge be omitted on a future trial. A brief but

excellent model of a charge upon the measure of damages, where the subject of the injury was a child, will be found in *Davis vs. The Central Railroad,* 60 *Ga.* 329.

The court erred in not granting a new trial, more especially upon the 40th ground of the motion. But we put the reversal of the judgment upon the whole case, and think its merits should be investigated anew, in the light of this opinion. As to grounds of the motion which we have not referred to, we regard them as free from substantial error.

Judgment reversed.