## CITY OF ACWORTH *v*. WESTERN & ATLANTIC RAILROAD CO.

1. The general welfare clause of the charter of the City of Acworth is broad and comprehensive; and under it that city could enact a reasonable ordinance requiring a railroad company to keep a watchman at certain street-crossings over its line of railway in said city.

2. All municipal ordinances based on general powers in a charter must be reasonable.

3. Generally the reasonableness of a municipal ordinance, based upon general powers in the charter of the municipality, is a question of law for the court to decide, unless its reasonableness depends upon the existence of particular facts which are in dispute; but it sometimes becomes a question of fact whether, under a given situation or circumstances, an ordinance, or its administration, is reasonable. The administration of an ordinance which can not, as a matter of law, be declared to be unreasonable may become unreasonable and its enforcement improper at certain times, places, or under certain circumstances.

4. We can not say, as a matter of law, that the ordinance of said city of September 15, 1923, requiring the railroad company to maintain a watchman at all street-crossings over its railroad within 300 yards of its depot in said city, is unreasonable or unconstitutional in and of itself, so far as the railroad company is concerned, looking at the ordinance alone, and in the absence of extrinsic facts showing its operation and administration to be unreasonable or to produce unconstitutional results.

(*a*) But where the railroad company had erected and was maintaining a system of signals at such street-crossings, known as wigwags, which were as efficient as watchmen in safeguarding persons and property passing over such crossings, and where the employment of watchmen involved much heavier expenditures than the installation and maintenance of such system of signals, the enforcement of said ordinance, under such circumstances, was unreasonable and an unconstitutional administration thereof.

(*b*) If the public safety required the keeping of watchmen at such crossings, the fact that their employment would involve expenditures so heavy as to impair the efficacy of the railroad as an agency of interstate commerce, or even cripple the company financially, would not render this ordinance violative of the commerce and due-process clauses of the Federal constitution.

5. The power given to the city council of Acworth, in its charter, "to declare what shall be a nuisance," did not authorize it to declare the installation and maintenance by a railway of a legitimate system of signals at street-crossings over its line of road to be nuisances and to prohibit the same, without notice to the railroad company and an opportunity to be heard upon the question whether such system was in fact a nuisance. Only things which are nuisances by the common law or by statute or are nuisances per se can be summarily suppressed.

6. Applying the above principles, there was evidence to authorize the chancellor to find that the enforcement of this watchman ordinance

was unreasonable; and we can not say that he abused his discretion in granting the interlocutory injunction prayed.

No. 4147. JANUARY 23, 1925.

Injunction. Before Judge Blair. Cobb superior court. December 7, 1923.

The Western & Atlantic Railroad Company filed its petition against the City of Acworth, in which it made these allegations: Petitioner is a railroad corporation of this State, operating a line of railroad from Atlanta, Ga., to Chattanooga, Tenn., and is engaged in the transportation of passengers and freight over said railroad in interstate and intrastate commerce, more than 50 per cent. of its business being interstate. Said line runs through the City of Acworth, a small town containing a population of about 1000 or 1500 people, and extending over an area five eighths of a mile in every direction from petitioner's depot. The charter of the City of Acworth gives to its mayor and aldermen the power "to remove nuisances," and "to furnish and maintain all things needful for the protection of life, liberty, and property, the maintenance of law and order, and to such other purposes as may in their discretion pertain to the proper and legal government of the city," and provides that the city council "shall have the right, power, and authority to declare what shall be a nuisance, and to provide punishment of persons who may create or continue nuisances," and that punishment for any violation of the city ordinances shall not exceed $100 fine, three months imprisonment in the city guard-house, three months work on the street chain-gang or other public works, one or more, or all three, in the discretion of the trial court. The administration of the affairs of the city is committed to the mayor and five aldermen, and its municipal court for the trial of violators of its ordinances is held by the mayor, and in his absence or disqualification by the mayor pro tem. Heretofore, at great expense and without any reasonable necessity therefor, petitioner has been required by said City of Acworth to maintain watchmen at two street crossings, one of them 275 feet north and the other 650 feet south of its passenger depot, these two crossings being the only ones within 300 yards of said depot. For some years prior to the filing of its petition a watchman has been maintained by petitioner at the crossing north of the depot, and one at the crossing south of said depot since June, 1922, at an ex-

pense of $82.96 per month for each. Being bound by a desire to operate its railroad with economy so far as is consistent with the public safety, and by the act of Congress of 1920, known as the transportation act, which limits its expenses for maintenance of way and structures, petitioner has been for some time considering whether it was not desirable, with due regard to economy and safety and protection of the public, to substitute for human watchmen at such crossings a signaling device sometimes called a "wigwag." Such devices are in general use by many of the best equipped and conducted railroads in the United States, and efficiently serve the purpose of protecting the public at such crossings. This signaling device gives notice of the approach of trains at crossings by ringing a bell and swinging a vertical arm, and, during hours of darkness, displaying a red light on such arm, giving ample opportunity to persons approaching and intending to cross to desist in time to avoid danger.

On September 15, 1923, the mayor and aldermen of said city adopted an ordinance which provides "that on and after the 15th day of September, 1923, every person, firm, or corporation operating a railroad through the City of Acworth shall be required to keep and maintain a human watchman at all public railroad crossings where said railroads cross the public highways or streets within 300 yards of the Western & Atlantic Railroad depot, or where same is now located in said City of Acworth, every day in the week, Sunday excepted, between the hours of six o'clock a. m. and six o'clock p. m., for the purpose of warning travelers of the approach of trains, in the same manner as watchmen are now kept at the two crossings, one north of said depot and one south thereof and within 300 yards of said depot. This ordinance is not made to repeal ordinances now existing on the subject, but as cumulative thereof. . . Any person, firm, or corporation violating this ordinance shall be punished by a fine of not less than $1.00 and not more than $100.00 for each day same is violated." The maintenance of human watchmen at such crossings would be far more expensive than the installation and maintenance of said signaling device, and less conducive to the protection of the public, not only because human watchmen are likely to become inattentive to their duties, subject to illness or to being absent, but also because said signaling device is one which petitioner can and intends to operate every

day in the week and during the night. Said ordinance is unreasonable, arbitrary, in excess of the power of said mayor and aldermen to adopt and enforce, and violative of petitioner's rights; and the enforcement thereof would deprive petitioner of its property and liberty without due process of law, in violation of the fourteenth amendment to the constitution of the United States. Said mayor and aldermen, without authority under said charter and in violation of the rights of petitioner and with intentional disregard thereof, on October 17, 1923, passed an ordinance amending the above ordinance of September 15, 1923, by adding the following provision: "It shall be unlawful for any railroad company or any engineer or other person in charge of any engine or locomotive, with or without cars attached to same, to run over either of said crossings or streets at said crossings, at the points mentioned in said ordinance, until and unless a watchman is stationed and kept as provided in said ordinance at each of said points on said street or at said crossing. . . And in case such violation is by an individual not a corporation, said person shall be subject to a fine as above mentioned, and in addition to be sentenced to work on the public streets, or confined in the calaboose not more than fifty days, either one or all in the discretion of the mayor." On the same day the mayor and aldermen passed another ordinance which prohibits "erecting of any signaling device which rings a bell known as a 'wigwag' or other noisy or dangerous device of a like nature within the city limits," and which declares that "such a device or apparatus known as a 'wigwag' as above described is hereby declared to be a nuisance." The ordinance provides that any person, firm, or corporation violating the same shall be punished by a fine of not less than $1 and not more than $100, and "any person, not a corporation, who is an agent, servant, or employee of such corporation, or any other person violating this ordinance shall be punished as above described, and in addition be sentenced to work on the public streets or confined in the calaboose not more than sixty days, either one or all in the discretion of the mayor. Any engineer or other person directing the erection of such a device herein prohibited, or any laborer performing any work or labor in building, erecting, or connecting with electric wires such a device as herein prohibited, shall be deemed to have violated this ordinance, and shall be, on conviction thereof, fined or sentenced as herein provided.

Any railroad company or other corporation violating this ordinance and having a local agent in the City of Acworth, said agent shall be held responsible for such violation and shall be penalized as herein provided."

The passage of such ordinance was without the power of the mayor and aldermen of said city, and was and is arbitrary and unreasonable, violates the rights of petitioner, and its enforcement would be in contravention of the fourteenth amendment of the constitution of the United States, in that it would deprive petitioner of its liberty and property without due process of law. Said two last-mentioned ordinances were not passed until petitioner had actually begun work on installing said signaling device and until same was practically completed at an expense of approximately $2500, said work having been done openly and with knowledge of the city. On account of inclement weather said work was not finished on October 18, 1923, and on October 19, 1923, one of petitioner's employees, W. Collins, acting under the direction of petitioner's signal engineer, was proceeding to install the electric battery and connecting the wires necessary for the entire completion of said device, when two of the employees under said Collins, John McDonald and J. A. Blevins, were arrested by the marshal of said city under the direction of the mayor and were taken before the mayor's court, charged with the violation of said last-mentioned ordinance. They were required to give an appearance bond of $100 each, and their trial was set for October 23, 1923. It is the intention and purpose of the defendant, acting through its mayor, to continually arrest and punish any of the agents or servants of petitioner who shall take any part in installing or maintaining said signal device, or in running its trains and protecting the public by or with the help of such device, or in running its trains through said city without keeping human watchmen at said crossings. Petitioner is remediless to prevent such arrests and prosecutions and to assert its rights, without the aid of a court of equity. It prays for injunction against the enforcement of said ordinances.

By an amendment the petitioner made these allegations: In addition to the above ordinances the mayor and council of Acworth adopted two others. One, adopted August 2, 1907, provides that "the rate of speed of locomotives and cars running through said city, within signal-posts on either side of the depot about 350 yards,

shall not exceed ten miles per hour.   The engineer and conductor in charge of the locomotive or locomotive and cars exceeding said rate of speed within said limits shall be held responsible for the violation of this ordinance.   The blowing of whistles of locomotives by engineers or other persons within 350 yards of said depot in either direction is hereby prohibited, other than that which is absolutely necessary, such as calling in flagman, danger-signals, etc. Engineers and enginemen of said locomotives are hereby required to signal the approach of their locomotives and cars to crossing within said limits by ringing or tolling the bell of the locomotive.   Any engineer, conductor, or other employee of the railroad company operating in said city, violating the provisions of this ordinance or any of them, shall be punished as provided in section 35 of the ordinances of said city.   It shall be the duty of marshal of said city to strictly enforce this ordinance by the arrest of all parties violating the same, and his failure to do so shall be good cause for discharging him and dismissing him from office.   Also be it further ordained that the N., C. & St. L. and L. & N. Railroad Company be required to furnish a week-day watchman at main crossing in front of Orlando Awtrey & Sons store during business hours.   This ordinance to be in effect by September 7th, and the aforesaid railroad companies shall have a watchman on duty by September 7th." The other ordinance was passed on November 5, 1920, and provides that "the N., C. & St. L. and L. & N. Railroad Companies be required to furnish a week-day watchman at crossing south of depot near knitting-mill, during the hours from 6 a. m. until 6 p. m.   This ordinance to be in effect by Dec. 10, and the aforesaid railroad companies shall have a watchman on duty by Dec. 10th, 1920." Said ordinance of November 5, 1920, refers to the public crossing first south of said depot and within 300 yards thereof. So that the last two ordinances refer to the same public crossings as those referred to in the original petition.

Notwithstanding the hardship and expense imposed on petitioner by said ordinances of 1907 and 1920, and that said ordinance of 1907 is so uncertain and indefinite as to the hours within which the watchman is to be maintained as to be void, petitioner in good faith and to protect the public complied with said ordinances and kept said watchmen at said crossings.   Finding that said ordinances, even if they had been definite and reasonable when adopted,

have become unreasonable by reason of the great changes and improvements made in the matter of affording protection to the public, to itself and employees, and desiring to afford such protection continuously by day and night and on Sundays as well as week days, petitioner determined to avail itself and the public of the more efficient and economical method of such protection provided by what is described in its petition as the audible and visible signal, for brevity called the "wigwag." Petitioner was further moved and required so to act by the positive provisions of the transportation act of 1920, which require the efficient and economical management of its property and affairs. Petitioner was proceeding to. install said visible and audible signals when the city passed said arbitrary, illegal, and unreasonable ordinances hurriedly and attempted their enforcement. Said last-mentioned ordinances, as well as those enacted prior thereto, were adopted hurriedly, without investigation or study by the city or its mayor and council as to what were the best methods of affording proper protection to the public, and especially without inquiry as to the difference in cost and efficiency between protection by human watchmen and such audible and visible signals. Petitioner is forced to believe, and alleges, that said ordinances of September and October, 1923, were adopted for the sole purpose of trying to force petitioner to maintain human watchmen, regardless of whether the same would be the most efficient protection. Said ordinances impose a direct burden upon interstate commerce, because if enforced they would require petitioner to expend money out of its operating revenue uneconomically, the amount of said operating revenue being dependent, as fixed under said transportation act, upon the value of the property and operating revenues of the Southern group of carriers, the rates allowed for transportation and allowances for expenditures being governed by honest, efficient, and economical management. To require carriers to waste their operating revenues would necessarily constitute, under the system of rate-making provided by the interstate-commerce act and amendments thereto, including said transportation act, a burden upon interstate commerce, contrary to law, to said interstate-commerce act as amended, and to the fourteenth amendment to the constitution of the United States, in that it would take the property of petitioner without due process of law.

The defendant demurred to the petition as amended, on the grounds: (1) that it set forth no cause of action; (2) that under its allegations plaintiff is not entitled to the equitable relief prayed; (3) that the petition does not set forth any intervening equity or other proper defense of which the plaintiff could not avail itself at law; (4) that plaintiff has a complete and adequate remedy at law; (5) that said petition sets forth no reason why a court of equity should take part in the administration of the penal ordinances of defendant; (6) that the petition does not show that the administration of the municipal ordinances complained of should be enjoined for the protection of any property or property rights or franchises against irreparable injury.  The defendant filed also an answer in which it admitted the allegations as to the passage of the ordinances mentioned, and set up that under its charter it had the power to pass said ordinances.  It denied that said ordinances were unreasonable and arbitrary, and alleged that the passage thereof was required on account of the large and almost continuous flow of daily travel from one side of the city to the other over said crossings; that the crossings were used daily for switching purposes; that between the hours of 6 a. m. and 6 p. m. thirty trains pass said crossings.  Seven are through passenger-trains, and pass said crossings going 35 to 45 miles per hour.  There are no less than twenty through freight-trains which pass at from 30 to 40 miles an hour.  The north crossing is situated in the center of the business district of said city, and business exigencies demand continuous travel over said crossings.  The main highway from Dallas to Woodstock and Canton crosses said tracks, and traffic from Emerson and Cartersville and sections north of Acworth crosses said tracks en route to Woodstock and the Southern Oil Company's plant in the southwestern part of Acworth, and traffic from sections south of Acworth crosses en route to Canton.  The average number of persons and vehicles passing over the north crossing daily is 2500, many of whom are school children.  The crossing south of said depot is on a dangerous curve.  There are buildings on the east side of said tracks and south of said crossing, which obstruct the view of persons approaching same from the east side, and for days at a time there are box-cars and other railroad cars left by plaintiff on the side-track farthest east, which obstruct the view. Trains from the south make very little noise so as to give notice of

their approach. There are four tracks at said south crossing. The average number of persons and vehicles passing daily over said south crossing is 1500, a large number of whom are school children.

The hearing of the demurrer and the application for temporary injunction were had at the same time. The plaintiff introduced a great volume of evidence, consisting of testimony of engineers, expert operators of railroads, and others, to the effect that the device known as the "wigwag" signal was more efficient in the protection of life and property at railroad crossings than watchmen, and that the same had given general satisfaction in other places and at other crossings where it had been installed. The defendant introduced evidence tending to show that the "wigwag" signal would often ring when no train was approaching; that at times it would not signal when trains were approaching; and that the constant ringing of the bell when trains were not approaching demoralized travel and interfered with business. The plaintiff introduced evidence to show that the constant ringing of the bell was due to switching operations over these crossings, that the railroad had taken steps to prevent this, and that the failure of the signal to operate was due to certain causes which the railroad undertook to remove.

The trial judge overruled the demurrer, and granted a temporary injunction. To these rulings the defendant excepted.

*Gordon M. Combs* and *J. Z. Fosler,* for plaintiff in error.

*Tye, Peeples & Tye, Fitzgerald Hall,* and *Morris, Hawkins & Wallace,* contra.

Hines, J. (After stating the foregoing facts.)

1. The general welfare clause of the charter of the City of Acworth is broad and comprehensive. Acts 1903, p. 413, §§ 1, 6, 8. Under such authority, in the exercise of its police power, the City of Acworth could enact reasonable ordinances regulating the rate of speed at which cars propelled by steam may be run between certain points within its limits, and requiring the railroad company to keep a watchman at certain street crossings over its line of railway. *W. & A. R.* v. *Meigs,* 74 *Ga.* 857 (2) ; *W. & A. R. Co.* v. *Young,* 81 *Ga.* 397 (3) (7 S. E. 912, 12 Am. St. R. 320) ; *A. & B. R. Co.* v. *Montezuma,* 122 *Ga.* 1 (2) (49 S. E. 738) ; *N., C. & St. L. Ry.* v. *Peavler,* 134 *Ga.* 618 (68 S. E. 432) ; *Hall* v. *G. S. & F. R. Co.,* 144 *Ga.* 145 (3) (86 S. E. 316). While there are respectable au-

thorities which hold that a municipality, under the general welfare clause in its charter, can not pass an ordinance requiring a railroad company to keep watchmen at street crossings over its line of railway within its limits, this court is now fully committed to the contrary doctrine, as is shown by its decisions above cited.

2. All municipal ordinances based on general powers in a charter must be reasonable. *Mayor &c. of Savannah* v. *Cooper*, 131 *Ga.* 670 (63 S. E. 138) ; *Mayor &c. of Shellman* v. *Saxon*, 134 *Ga.* 29, 32 (67 S. E. 438, 27 L. R. A. (N. S.) 452). In *W. & A. R. Co.* v. *Young*, supra, this court held, in dealing with an ordinance requiring a watchman at a crossing, that "No unreasonable ordinance can be valid." "Municipal ordinances must be reasonable. The limitations of the power of a city council in this regard are not to be measured by the more extensive powers of the State legislature." *Atlantic Postal &c. Co.* v. *Savannah*, 133 *Ga.* 66 (65 S. E. 184). So it is now firmly and well established, that ordinances under general powers in municipal charters must be reasonable.

3. Generally the reasonableness of a municipal ordinance, based upon general powers in the charter of the municipality, is a question of law for the court to decide, unless its reasonableness depends upon the existence of particular facts which are in dispute. *Metropolitan &c. R. Co.* v. *Johnson*, 90 *Ga.* 500 (7) (16 S. E. 49) ; *N., C. & St. L. Ry.* v. *Peavler*, supra. While the above is the general rule, it sometimes becomes a question of fact whether, under a given situation or circumstances, an ordinance or its administration is reasonable. The administration of an ordinance which can not, as a matter of law, be declared to be unreasonable, and which on its face is reasonable, may become unreasonable, and its enforcement improper at certain times or places or under certain circumstances. The operation of an ordinance, legally fair and reasonable upon its face, may become unreasonable, just as the operation of a statute, which is constitutional upon its face, may be unconstitutional. So upon its face the Georgia blow-post law (Civil Code (1910), §§ 2675, 2677) was held by the Supreme Court of the United States not to be a direct burden upon interstate commerce, and to be constitutional in the absence of facts establishing such direct burden. *Southern R. Co.* v. *King*, 217 U. S. 524 (30 Sup. Ct. 594, 54 L. ed. 868). Yet, under certain circumstances and under a given state of facts tending to show such direct burden

upon interstate commerce, that court held our blow-post statute to be unconstitutional. S. A. L. Ry. *v.* Blackwell, 244 U. S. 310 (37 Sup. Ct. 640, 61 L. ed.    , L. R. A. 1917F, 1184). So we have the anomaly of a statute constitutional on its face and unconstitutional in its operation under certain facts. So in *Central R. Co.* v. *B. & W. R. Co.,* 87 *Ga.* 386 (4), 391 (13 S. E. 520), this court held, that the court could submit to the jury the question whether an ordinance, regulating the speed of trains within the whole area of the city, and which was reasonable in itself, was or was not reasonably applicable to a particular locality just inside the city limits. In *Jackson* v. *S. A. L. Ry.,* 140 *Ga.* 277 (78 S. E. 1059), this court followed the foregoing ruling, and approved this instruction of the trial judge: "The court decides as a matter of law that such an ordinance would be reasonable, but whether it was reasonable and applicable to the time and place where it is alleged this injury occurred is for you to consider and determine along with the other evidence in the case." So time, place, and circumstances may render the operation of an ordinance unreasonable, although the ordinance can be held as a matter of law to be in itself reasonable. See Galveston Electric Co. *v.* Galveston, 258 U. S. 388 (8) (42 Sup. Ct. 351).

4. Are the ordinances of September 15, 1923, and October 17, 1923, the former requiring the railroad company to maintain a watchman at all street-crossings over its railroad within 300 yards of its depot in the City of Acworth, and the latter making it unlawful for any railroad company or any engineer or other person in charge of any engine or locomotive, with or without cars attached, to run over said crossings unless a watchman is kept at each of said crossings, unreasonable? We can not say, as a matter of law, that these ordinances are unreasonable or unconstitutional in and of themselves, so far as the railroad company is concerned, looking at the ordinances alone, and in the absence of extrinsic facts showing their operation to be unreasonable or to have unconstitutional results. Thus pronouncing them valid on their faces, and reasonable in themselves, and as a matter of law, is their operation or administration unreasonable or unconstitutional, in the face of the extrinsic facts in this record? What are these facts? The first is the large expenditure of funds to pay the watchman at the crossings. If the public safety requires the employment of watch-

men at these crossings, the fact that the execution of this plan would involve expenditures so heavy as to impair the efficiency of the railroad as an agency of interstate commerce, or even cripple the company financially, would not render these ordinances violative of the commerce and due-process clauses of the Federal constitution.  Erie Railroad Co. v. Public Utility Commrs., 254 U. S. 394 (5) (41 Sup. Ct. 169).  The financial welfare of the company must yield to the public safety.

But there are facts in the record which authorized the trial judge to find, that the heavy expenditure necessary to employ these watchmen was unnecessary; and that the requirement of these ordinances, that the company should employ these watchmen and incur this heavy expense, was unnecessary and useless.  There was abundant evidence to justify the judge in finding and holding, that the installation and operation of the signaling device known as a wigwag at these crossings dispensed with the necessity of keeping watchmen there.  This being so, the enforcement of these ordinances was unreasonable and unconstitutional, as the company could save large expenditures by the erection and operation of this device.  If in the progress and improvement of railroad transportation mechanical devices for the safety of persons and property passing over crossings are devised, which are as efficient as human agencies and much more economical, it would be unconstitutionally depriving a railroad company of its property to compel it to employ human agents instead of such mechanical appliances.  In such circumstances the company is entitled to supplant men with mechanism. Industrial revolution is forever furnishing examples of such changes.  The hand-loom yielded to the power-loom, the spinning-wheel to the spinning-jenny, the stage-coach to the railroad, the errand-boy, bearing messages, to the telephone, writing with pen and ink to the typewriter, the message by post to messages by telegram, cablegram, wireless and radio, and the street-railway seems doomed by the jitney.

What we rule is this: that the trial judge was authorized to find, if such conclusion was not demanded by the evidence, that the wigwag signal was as efficient to protect people and property passing over these crossings as watchmen, that it furnished protection and safety at all hours of the day and night, which the employment of watchmen under these ordinances failed to do, and was much less

expensive than the maintenance of watchmen at these crossings. This being so, these ordinances, although on their faces reasonable, are in their effect and administration unreasonable and unconstitutional, and the trial judge did not err in enjoining their enforcement.

5. We have no hesitation in holding, as a matter of law, that the ordinance of October 17, 1923, which prohibits the erection of "wigwag" signals at these crossings, and which declares these signals to be nuisances, is unreasonable and unconstitutional. This ordinance does not provide for any hearing on the question whether this device is a nuisance. It condemns without notice and opportunity to be heard. Railroading is a lawful business, as strange as this may sound to some people. The installation of devices by railway companies for the safety and protection of persons and property, which pass over their crossings, is legitimate and commendable. The power, given to the city council of Acworth, "to declare what shall be a nuisance" and to punish "persons who may create or continue nuisances," does not authorize the council of this city to prohibit a lawful business or some legitimate agency used in the conduct of such business, without notice and an opportunity to be heard on the question whether the agency is in fact a nuisance. Some nuisances can be summarily suppressed. Such are nuisances declared to be such by the common law or by statute, or such as are nuisances per se. *W. & A. R. Co.* v. *Atlanta,* 113 *Ga.* 537 (38 S. E. 996, 54 L. R. A. 294); *Rowland* v. *Morris,* 152 *Ga.* 842 (111 S. E. 389); *Griggs* v. *Macon,* 154 *Ga.* 519 (114 S. E. 899). But when the city council of Acworth undertook to declare by ordinance this signal to be a nuisance, and to prohibit its installation and use, without notice and an opportunity to the railroad company to be heard, such ordinance was a mere *brutum fulmen,* and the same was arbitrary, unreasonable, unconstitutional, and void.

So we are of the opinion, that the trial judge did not abuse his discretion in granting an interlocutory injunction in this case.

*Judgment affirmed. All the Justices concur, except*

Russell, C. J., and Atkinson, J., dissenting from the rulings in subdivision (*a*) of the fourth headnote, and in the sixth headnote. The latter ruling refers to the ordinance requiring watchmen at two designated grade crossings. There was evidence to

show that these were dangerous crossings and such as to render it appropriate for the city council, under the police power conferred by the municipal charter and in the exercise of the discretion of the city council, to pass and enforce an ordinance requiring the railroad company to maintain watchmen at such crossings. Whether the city council would exercise such power was primarily a question for its determination. While the superior court might review the decision of the mayor and council, such reviewing power must be exercised with caution, and no interference had unless it is clear and manifest that the city council exceeded its power or abused its discretion vested by law. See *Gaines* v. *Dyer*, 128 *Ga.* 585, and citations. The facts before the judge did not show that the passage or enforcement of the ordinance referred to exceeded the powers conferred upon the municipality, or that they amounted to a manifest abuse of discretion. It was therefore erroneous for the trial judge to enjoin the enforcement of the ordinance.