WESTERN AND ATLANTIC RAILROAD COMPANY *et al.*

*v.* CITY OF ATLANTA *et al.*

1. Save and except as to those things which are by the common or statute law declared to be nuisances per se, or which are in their very nature palpably and indisputably such, neither the municipal authorities of any city of this State, nor any department thereof which has been given the power to abate nuisances, has the legal right summarily to compel the abatement of a particular thing or act as a nuisance, without reasonable notice, to the person

alleged to be maintaining or doing the same, of the time and place for hearing and determining whether such thing or act does in law constitute a nuisance.

2. Jurisdiction to abate nuisances existing in the cities of this State having a population of twenty thousand or more, in a summary manner, except as to things or acts of the nature first above indicated, resides alone in the police court of the city where it is claimed such nuisance exists.

Argued May 1, — Decided May 22, 1901.

Petition for injunction. Before Judge Lumpkin. Fulton superior court. March 16, 1901.

*Payne & Tye, Dorsey, Brewster & Howell,* and *Arthur Heyman,* for plaintiffs in error.   *J. L. Mayson* and *W. P. Hill,* contra.

LITTLE, J.   The Western and Atlantic Railroad Company and others presented a petition to the judge of the superior court of Fulton county, in which it was alleged that on February 7, 1901, certain employees of the City of Atlanta, acting under the direction of its board of health, began to forcibly take up and remove the floor of the building in that city known as the union passenger depot, which is used as a railway station by all the railroads passing through or having terminals in said city. The board of health based its action on the ground that the floor sought to be removed was a nuisance endangering the public health. The petition also alleged that the floor, which was of wooden plank, was in good sanitary condition, and in the same condition in which it was when the building was erected and when the property was leased to the plaintiffs by the State, whose property it was and is ; that they had always kept the floor in good repair, substituting new plank for the old whenever necessary ; that the board of health had ordered them to remove the floor and place in its stead an asphalt floor or one pleasing to the board, but, because it was unnecessary and would be very expensive, and for other reasons specified, they did not comply with this order; that not until January, 1900, was there any complaint calling the attention of the plaintiffs to the sanitary condition of the floor ; that about that time surface-water in the streets, caused by excessive rainfalls, partially flooded the floor, and the plaintiffs, supposing that this gave rise to the complaint, and desiring that the remedy adopted should conform to the views of the city authorities, requested the city engineer to prepare plans for the draining of the surface-water, which he did, and these plans were carried out in the construction of sewers, after which nearly

all the planks in the floor were removed and new planks substituted, and since that time the floor has not been flooded. The petition further alleged that the board of health had no jurisdiction over the question as to whether the condition of the floor was a nuisance or not; that this is a judicial question, and the plaintiffs were entitled to be heard before their property could be condemned and abated as a nuisance; that there was no legal notice of any action proposed to be taken by the board of health, necessary to condemn the floor as a nuisance; that after the repairs above mentioned were made no action of any kind was taken by the board of health declaring the condition of the floor, as it existed on February 7, 1901, to be a nuisance; and that under the law applicable to the City of Atlanta the board of health has no power to determine the question as to what constitutes a public nuisance, Atlanta being a city of more than twenty thousand inhabitants, and jurisdiction as to what constitutes a nuisance being vested in another tribunal. It was alleged that thus removing the floor of the building would result in great inconvenience to the traveling public, and in irreparable damage to the plaintiffs, and that the individuals doing the damage were insolvent.

The defendants in their answer denied the allegations of the petition as to the sanitary condition of the floor, and set out their reasons for treating it as a nuisance. They contended that, under the existing conditions at the depot, a suitable floor could not be made of wooden plank. They averred that, under the charter of the city, the board of health is vested with authority to abate nuisances summarily and without resort to judicial proceedings; that this authority is not affected by the general law; that, in accordance with authority granted by the charter, the mayor and general council of the city adopted an ordinance providing that the board of health " shall have full power and authority to require the owner or occupant of a lot in the city to remove or remedy anything on said lot which, in the opinion of the board, may endanger the public health, and on failure of the owner or occupant to remove or remedy the same, the board shall direct the chief sanitary inspector to do so at the cost of said owner or occupant;" and that the removal of the depot floor was undertaken in accordance with the authority thus granted. It was denied, however, that the board was proceeding arbitrarily and without notice to the plaintiffs.

The answer averred that, more than a year before the action complained of, the board ordered the plaintiffs to remove the floor because of its unsanitary condition, and the plaintiffs, through their representatives, appeared before the board and admitted that the floor was in this condition, and that a plank floor could not be kept in sanitary condition, and agreed that if by December 1, 1900, no definite plans for the construction of a new depot should be agreed on, they would proceed without further delay to construct a permanent floor of granitoid, asphalt, or other material, satisfactory to the board of health ; that the board, after the thorough investigation then had, adjudged that the condition of the floor was a nuisance, and directed the chief sanitary inspector to make cases in the recorder's court against the plaintiffs, and to abate the nuisance, unless it was remedied ; that shortly before December 1, 1900, and at different times afterwards, the board of health communicated with the plaintiffs as to the condition of the floor, urging compliance with this agreement, and received assurances from the plaintiffs' representatives in charge of the depot (known as the board of control) that the agreement would be carried out, and at their instance more time was granted them, the last extension granted being until February 2, 1901, but no further action was taken by the plaintiffs, except to request a delay until February 7 ; and on that date the defendants, deeming it useless to delay further, undertook to remove the floor and replace it with a permanent floor of such character as would be sanitary and prevent the accumulation of water in and about the building.   The evidence submitted on the question as to whether the condition of the depot floor was a nuisance endangering the public health was conflicting.   The court admitted in evidence, over the objections of the plaintiffs, a resolution of the board of health, adopted February 2, 1900, declaring the condition of the depot floor to be a nuisance ; an agreement by the board of control representing the plaintiffs, the substance of which is stated in the answer of defendant ; certain correspondence passing between the board of health and representatives of the plaintiffs ; the minutes of the plaintiffs' board of control ; and testimony as to what took place at a meeting of the board of health, and as to the action taken by the board.

An injunction was refused, and the plaintiffs excepted, not only to the order refusing an injunction, but also to the overruling of ob-

jections made by them to the evidence as above set forth; which last ground, in view of the ruling made in the case, need not be considered. The assignment of error as to the refusal of an injunction is, that it was against the .equity of the case, and was in violation of the 14th amendment of the constitution of the United States, in that it deprived the plaintiffs of their property without due process of law, and that under the facts and law of the case the court had no discretion except to grant the injunction as prayed. No detailed statement of the evidence contained in the record is deemed to be necessary, but reference to such parts of it as become material will be considered in the discussion of the legal propositions by which the case is controlled.

We shall undertake to establish two propositions as being sound in law, and controlling in this case. The first is, that neither the municipal authorities of any city in this State nor any department of a city government have the legal right summarily to abate a nuisance, without first having given reasonable notice, to the person maintaining the thing or doing the act alleged to be a nuisance, of the time and place of hearing the question whether such thing or the doing of such act constitutes a nuisance, and the determination by such body that the thing so maintained or the act done, in law, constitutes a nuisance; and this rule of law applies to all acts and things alleged to be nuisances except those which are by the law expressly declared to be nuisances, or which are indisputably so per se. And this is true, notwithstanding the municipal authorities, or any department thereof, have by the charter of the town or city been given the power to abate nuisances in such city. The second proposition is that, under the law in force in this State, jurisdiction to abate nuisances existing in a city of twenty thousand population or more, except where the specific act done, or thing maintained, is declared by the common or statute law to be a nuisance, or is indisputably so per se, resides in the police court of such city. We are aware that, in entering the domain of the discussion necessary to support the proposition first above stated, we will encounter seemingly contrary rulings in many adjudicated cases and in treatises by learned text-writers. On the other hand, the principles there announced are, we think, supported by reason and a due regard to the right of protection to the property of the citizen, are favored by all courts and the distinct current of

the general authorities, and are recognized by our statutes. We eliminate entirely from the discussion reference to the rights of a private person to abate a public or private nuisance by his own act, for the reason that the principles of law which establish his right and fix his responsibility in so doing are not involved in this case; because, when according to the admitted facts certain members of the board of health of the City of Atlanta undertook to remove the floor of the union passenger station on the ground that it was a public nuisance maintained by the lessees thereof, which menaced the health of the city, this undertaking was for and in behalf of a recognized governmental department of the city, and the principle involved does not turn upon the question whether those members of the board of health who instituted such proceedings had or had not legal authority from the board so to do. It is sufficient for the purposes of this discussion that they assumed to do what was done in the name of that body. Nor do we think that the fact that the union passenger station was the property of the State of Georgia, which had been leased to one of the plaintiffs, would prevent the lawful abatement of a nuisance existing in such station building and maintained by the lessee. Reference was made in the argument to the legal principle that the State is not included in the operation of a general law, unless included eo nomine. The proposition is sound, but not applicable to the facts of this case. Assuming that the floor of the building which was sought to be removed as a nuisance was the property of the State, it is uncontested that such removal was attempted to be had for the purpose of replacing the plank floor with a permanent and more costly one at the expense of the lessee; and had this purpose been accomplished, no loss or deprivation of property would have been occasioned to the State. With these suggestions as a passing reply to the point made, we proceed to the discussion of the first proposition stated above.

1. By an act of the General Assembly, approved February 28, 1874 (Acts 1874, p. 116), a new charter was established for the City of Atlanta, in which, by section 67, the mayor and general council of the city were authorized to appoint one proper and fit person from each ward as a member of the board of health, and it was made the duty of said board to report to the mayor and general council all nuisances which were likely to endanger the health of any portion of the city; and the mayor and general council were

given power, upon the report of the board of health, to cause such nuisances to be abated, and its recommendations were to be carried out in a summary manner at the expense of the party causing the nuisance, etc.   By section 71 it is provided that the board of health of the City of Atlanta may exercise the same power as is now vested in the mayor and general council of said city, relating to the abatement of such nuisances as are likely to endanger the health of the city, to such extent, and under such regulations, as may be prescribed by the mayor and said general council.   Perhaps by the original and amended charter of the city further plenary powers in this respect were conferred; and we will assume for the sake of the argument that the board of health was invested both by the charter and municipal ordinances with the power to inquire into and, concurrently with the mayor and general council, to abate nuisances.   It may also here be noticed that the manner of such abatement was to be summary, and by the officers of the police department of the city under proper order.   It must not be understood, however, that the use of the term *summary* means or implies that it shall or may be done without proper investigation of the facts, or that it may be done without notice or an opportunity to be heard by the person who, it is alleged, committed the acts, or whose property is sought to be affected.   A *summary proceeding* is thus defined by Mr. Bouvier:   " A form of trial in which the ancient, established course of legal proceedings is disregarded, especially in the matter of trial by jury," etc.   And this eminent lexicographer, citing Blackstone and Chancellor Kent, together with a number of adjudicated cases, says, referring to such a proceeding, that in no case can a party be tried *summarily* unless such proceedings are authorized by legislative authority, except, perhaps, in cases of contempt; for the common law is a stranger to such a mode of trial.   Mr. Black defines a summary proceeding to be " any proceeding by which a controversy is settled, case disposed of, or trial conducted in a prompt, simple manner without the aid of a jury.  .  .  Proceedings are said to be summary when they are short and simple in comparison with regular proceedings, that is, with the proceedings which alone would have been applicable either in the same or analogous cases if summary proceedings had not been available."   So, then, the power given to abate nuisances in a summary manner does not at all mean

that they may be abated without notice or hearing, but simply that it may be done without a trial in the ordinary forms prescribed by law for a regular judicial procedure; and the abatement of a nuisance by the municipal authorities, after investigation and determination that a nuisance exists, on their order, by a police officer, is a summary proceeding.   Indeed it seems to be contemplated by the definitions referred to that a summary proceeding involves some kind of a trial; so that when the board of health was invested with power to abate nuisances in a summary manner they were not necessarily invested with the power to do so in the absence of any trial or inquiry into the facts without notice.   The weight of authority and our own statute is to the effect that, as to nuisances of the character which the board of health alleges the floor of the passenger station to have been, it can not lawfully be done without notice, and a judgment of the tribunal or department invested with power to abate.

In the case of Yates *v.* Milwaukee, 77 U. S. 497, the Supreme Court of the United States ruled two propositions: first, that the question of nuisances or obstructions must be determined by general and fixed law; second, that it is not to be tolerated that the local municipal authorities declare any particular business or structure a nuisance in such a summary mode (referring to the case), and enforce the decision at their own pleasure.   In the case under consideration in that court it appeared that the legislature of Wisconsin had authorized the common council of the City of Milwaukee by ordinance to establish dock and wharf lines along certain rivers, to restrain and prevent encroachments upon said rivers and obstructions thereto; and the city by an ordinance had declared a particular wharf to be an obstruction to navigation and a nuisance, and ordered it to be abated.   An injunction was applied for, to enjoin the city from interfering with the wharf ordered to be abated.   In the course of his opinion in that case Mr. Justice Miller says:   "The mere declaration by the city council of Milwaukee that a certain structure is an encroachment or obstruction did not make it so, nor could such declaration make it a nuisance unless in fact it had that character.   It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general law either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration

that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city at the uncontrolled will of the temporary local authorities." In the case of Hutton *v.* Camden, 10 Vroom, 122, it appears from the report that by the charter of the City of Camden the common council was authorized to establish a board of health and to define its powers and duties; that such council was authorized in its charter " to abate or remove nuisances of every kind, at the expense of those maintaining the same, and to compel the owner or occupant of any lot, house, building, shed, cellar, or place wherein may be carried on any business or calling, or in or upon which there may exist any matter or thing which is or may be detrimental, in the opinion of the sanitary committee or board of health, . . to the health of the inhabitants of the city, . . to . . abate the same . . under the direction of the city council," etc. Under this power the council passed an ordinance establishing a board of health, and provided that whenever the board of health should deem it advisable, for the public health of the city, forthwith to abate or remove any nuisance in the city, it was authorized and directed to cause the same to be abated at the expense of the owner. It further appeared that at a meeting of the board of health on a particular day a resolution was passed that a lot of a citizen on a certain street be declared to be a nuisance, and the owner was directed to fill it up to grade. The order not being complied with, the city did the work at considerable cost, and, the owner refusing to pay it, an action was instituted to recover it. Referring to this declaration of the board of health, that the lot was a nuisance, Chief Justice Beasley said: " Giving, therefore, to this resolution the utmost legal effect that can be ascribed to it, by conceding to the sanitary board a judicial capacity in the premises, still its action must be regarded as entirely void, inasmuch as it appears that it had not acquired jurisdiction over the plaintiff in error. The proceeding was *coram non judice,* and as such was not merely voidable but was an absolute nullity."

Judge Dillon in his great work on Municipal Corporations, in referring to nuisances and to the power to prevent and abate them, says: " It is to secure and promote the public health, safety, and convenience that municipal corporations are so generally and so liberally endowed with *power to prevent and abate nuisances.* This authority

·and its summary exercise may be constitutionally conferred on the incorporated place, and it authorizes its council to act against that which comes within the legal notion of a nuisance; but such power, conferred in general terms, can not be taken to authorize the extra-judicial condemnation and destruction of that as a nuisance which, in its nature, situation, or use, is not such." 1 Dill. Mun. Cor. (4th ed.) § 374. Mr. Wood in his treatise on the law of Nuisances (vol. 2, p. 977), says: "A municipal corporation which is empowered to declare what shall be nuisances is not thereby authorized to declare that to be a nuisance which is not so in fact. Things which may or may not be nuisances, where their character in this respect depends upon circumstances, can not be so declared in advance. The question when the thing may or may not be a nuisance must be settled as one of fact and not of law." "To determine what is by law a nuisance is an exercise of judicial power." State *v.* Noyes, 10 Foster (N. H.), 294. In the case of City of Denver *v.* Mullin, 7 Colo. 345, it was ruled that things which were not nuisances per se must lawfully be ascertained to be such, and the municipal authorities could not arbitrarily declare a thing a nuisance or destroy valuable property which is lawfully erected or created, without such lawful ascertainment, and except in exceptional cases, or where the thing is clearly a nuisance itself, it should be judicially determined. In Darst *v.* People, 51 Ill. 286, it was ruled that intoxicating liquors could not be taken away or removed under an ordinance declaring such liquors kept within the town limits to be a nuisance, before it had been judicially declared that the ordinance had been violated. But, as conclusive of the question so far as this State is concerned, we have only to refer to a provision of our law which has been in force since 1833, and which is found in the Civil Code, §§ 4760, 4761, 4762, 4763. The first of these sections provides that a nuisance may be abated by the order of two or more justices of the peace in the county where it exists, founded upon the opinion of a jury, and the order shall be executed by the sheriff of the county or his deputy. A further provision declares that if the nuisance complained of exists in a town or city under the government of a ·mayor, etc., such nuisance may be abated with the advice of the aldermen or council by order of the mayor; and, referring to this provision, section 4763 expressly declares that reasonable notice shall be given to the parties interested of the time and place of the meet-

ing of such justices and freeholders, or such mayor, intendant, alder-
men, etc. These provisions constitute a general law of this State.

It is, however, claimed that the charter of the City of Atlanta
was enacted subsequently to the passage of the act which contains
these provisions, and that the provisions of the charter have the
legal effect of rendering inapplicable the provisions of the statute
to the City of Atlanta; and the case of *Mayor etc. of Montezuma* v.
*Minor*, 70 *Ga.* 191, is relied on for the proposition that the special
authority granted to the board of health by the charter of Atlanta
was not affected by prior or subsequent general laws. Without con-
ceding that the case referred to is authority for the proposition that
the charter of Atlanta was not affected by a subsequent law, which
proposition will be discussed in another part of this opinion, we
must, in fairness, accept the ruling made in that case as sustaining
the proposition that a prior general law providing for the abate-
ment of nuisances does not prevent the legislature from subse-
quently conferring such power on the municipal authorities of a
city. In that case, as we understand the facts, the authorities of
the town of Montezuma sought to abate as a nuisance a mill-pond
from which was operated a grist-mill. To this attempt the defense
was interposed by the owner that, if it was a nuisance, the same
could not be abated by the authorities of the town, because, un-
der the act of 1833, referred to above, the ordinary of the county
alone had jurisdiction, and that the affidavit of two or more free-
holders was a condition precedent to the right of the ordinary to
summon a jury and adjudge whether the mill and adjacent water
was in fact a nuisance. This court ruled that the act incorporating
the town of Montezuma, being subsequent to the act of 1833, by
its terms divested the jurisdiction of the ordinary and vested the
power to abate nuisances within its limits in the authorities of the
town; and that under the charter of the town the municipal au-
thorities had full power to abate a nuisance on the report of the
board of health, although such nuisance consisted of a mill and
machinery run by water. But how does the ruling there made af-
fect the validity of the act of 1833 as to the requirement of notice
to the parties interested of the time and place of the meeting of the
mayor and council at which the question of the existence of the
nuisance is to be determined? The only change in this general law
which the *Minor* case, supra, effected was, that the ordinary was

deprived of the jurisdiction which the general law conferred on that officer within the limits of the town of Montezuma. It only effected a substitution of one governmental agency for another, leaving the act of 1833 otherwise of full force and effect, and especially that part of it which declares that reasonable notice shall be given to the parties interested of the time and place of meeting of the mayor and aldermen. No change in this provision was caused by the act incorporating the town of Montezuma, and no change was effected in this provision, as we think, by the act creating a new charter for the City of Atlanta. It was a summary proceeding to abate a nuisance, when done by the ordinary and a jury; it is none the less a summary proceeding when, after notice, the nuisance is ordered to be abated by the mayor or board of health.

Another proposition is relied on by the defendant in error to sustain its theory of the law of the case, to wit: that where a duty is imposed, or a discretion vested in a person or body, the exercise of this discretion is final. The proposition as stated is undoubtedly sound, but, while it is so, it is fundamental law that the performance of the duty, and the exercise of the discretion, in a case where personal liberty or private rights are involved, can not legally be had in the absence of a notice to the person interested, that he may have an opportunity to contest the facts in relation to which such person or body is to exercise its discretionary power. The case of *Mayor of Americus* v. *Mitchell,* 79 *Ga.* 807, is not at all in conflict with the proposition which we are endeavoring to sustain. In that case, it appears that the municipal authorities were seeking to abate as a nuisance a mill-pond within the limits of the city, and by the answer it appears that there was a *judgment* of the mayor and aldermen condemning the pond as a nuisance. A bill was filed seeking to enjoin the authorities from proceeding to destroy the dam which collected the water in the pond, on the ground that it was not a nuisance, and this court ruled that, under the charter and ordinances of the city, the mayor and council, on the recommendation of the board of health, had full power in a summary manner to abate nuisances, and that it was for that body to determine whether it was a nuisance or not. If they came to the conclusion that it was, they had the right to abate it in a summary manner. No point was made by the owner of the mill that he had no notice of the proceedings which were had under which his property was declared to be a nui-

sance. It is evident, however, that such proceedings were had,·
from the fact that there was a judgment of condemnation by the
mayor and aldermen; the only complaint was that this judgment
was wrong. The effect of the ruling made is, that a court of equity
will not interpose to enjoin the execution of the judgment rendered;
on the ground that the finding was wrong. This case does not, in
our judgment, construe the section of our code, requiring notice to
the persons interested, differently from the view which we now take
of it. In *Dunbar* v. *Augusta*, 90 *Ga.* 390, cited by counsel for
defendant in error, Chief Justice Bleckley said, in his opinion ren-
·dered in the case, that it was evident that the board of health did
in fact consider and decide that the corn was dangerous to the pub-
lic health, and that the chief, if not the only reason suggested against
the binding force of that decision was that it was made without notice
to the owners of the property. As meeting this point fully, and
entirely, this eminent jurist said: " But, according to the authori-
ties, notice was not essential except for the purpose of rendering
the decision conclusive, the nuisance in question, if one at all, being
a *nuisance at common law.*" We are not contending that where the
particular thing, or the act sought to be abated, is made a nuisance
by statute or is characterized as such by the common law, any in-
·quiry or notice is necessary, because the question as to whether it is
in fact a nuisance is already determined; but when the act or thing
is not made so by the common or statute law, as in this case, the
question whether it is or is not a nuisance is a judicial one, to be
passed upon by the tribunal having power to abate it after notice
to the party interested.

The case of *Mayor etc. of Savannah* v. *Mulligan*, 95 *Ga.* 323,
is cited on this point by the defendant in error in support of its
contention; but the ruling made in that case, we think, does not
require a different construction of the statute providing for notice
than the one we have given to it. In that case Mulligan insti-
tuted an action against the city to recover the value of a feather-
bed, pillows, and a mattress, destroyed by a sanitary inspector un-
der orders of its health officer. This court ruled there, that un-
less the property destroyed was itself a nuisance endangering the
public health or safety, it was wrongfully destroyed; but that if it
did so endanger the public health, it might be destroyed by the
authorities lawfully and without paying the owner its value, if the

charter of the city conferred on it the power to abate such nuisances. The decision referred to the provisions incorporated in the Civil Code, § 1456, as follows: "Analogous to the right of eminent domain is the power from necessity vested in corporate authorities of cities, towns, and counties to interfere with and sometimes to destroy the private property of the citizen for the public good, such as the destruction of houses to prevent the extension of a conflagration, or the taking possession of buildings to prevent the spread of contagious diseases." By the facts of the case it was shown "conclusively," said Chief Justice Simmons who delivered the opinion, "and beyond question, that the property destroyed was *in fact* a nuisance endangering the public health, having been used . . by a person who had scarlet fever, a highly contagious disease; and the mayor and aldermen of the city, under its charter, had ample authority to abate the nuisance" in question. It may be well to consider at this point, for a moment, the power of municipal authorities to abate certain nuisances without any proceedings whatever except to order their abatement. These are, we think, not only such things as are by the law declared to be nuisances but also those which are indisputably so per se. In each of these cases a necessity exists to destroy private property in order to protect the public. Vicious animals which are accustomed to attack a man are nuisances, and, under certain circumstances, may be killed, without any proceedings whatever, either by a private person or by order of the municipal authorities. It is a public nuisance for one who is infected with an infectious or contagious disease to expose himself in a public place. To take a horse infected with glanders into a public place is such. Mr. Tiedeman in his work on Municipal Corporations, § 120, citing 43 Ala. 398; 4 Yerger, 163; 105 Ill. 207; 9 Wendell, 571, declares that where the property or act is per se a nuisance, the power of the municipality is unquestioned, though its exercise may involve the destruction of private property. In his work on Limitations of Police Power, § 122 (g), the same author declares that in certain cases of extreme necessity the private individual may without the aid of government abate or remove the nuisance (referring to a public nuisance); in other cases the government through its proper department must interfere. In the *Mulligan* case, supra, the property destroyed was a nuisance per se, which threatened the health of the people generally. Being

a nuisance per se, there was no necessity for any inquiry, and hence no need of notice. The further cited case of *Morris* v. *Columbus*, 102 *Ga.* 792, has, we think, but little application to the point now under discussion. Morris questioned the constitutionality of the act of the General Assembly which had conferred upon the City of Columbus authority to require vaccination; and the court simply ruled that, in the exercise of the police power, the General Assembly may confer upon the authorities of the city power to make and enforce an ordinance requiring all persons within the limits of the corporation to submit to vaccination, whenever an epidemic of smallpox is existing or may be reasonably apprehended. The only question of fact which could arise in that case was whether the occasion for the enactment of such an ordinance had arisen. And, on an entirely different principle from any which we have invoked, the municipal government must of course be the final and conclusive arbiter as to the existence of such conditions.

It is our opinion that the provisions of our code require, when a municipal corporation is seeking to abate a nuisance such as it was alleged the floor of the union passenger station was in this case, that the parties interested be given reasonable notice of the time and place of hearing at which the fact whether the property complained of is or is not a nuisance shall be inquired into and determined; that, without such notice and a judgment on the facts by the body invested with power to abate the nuisance, it is unlawful to enter thereon and remove or destroy it as a nuisance. If the thing, as we have said, is declared by law to be a nuisance, or if it is unquestionably a nuisance, such as a rabid dog, infected clothing, the carcass of a dead animal on a private lot, the presence of a smallpox patient on the street, it may be abated by the municipal authorities at once, by order, from the necessity of the case, and to meet an emergency which exists, to at once protect the health and lives of the people.

2. We now proceed to the consideration of the second question presented, namely, upon what department of the municipal government, under the laws of this State, devolves jurisdiction to abate nuisances in a city having a population of twenty thousand or more? The provisions of the act of 1833, which are incorporated in section 4760 of the Civil Code, declare that any nuisance which tends to the immediate annoyance of the citizens in general, is man-

ifestly injurious to the public health and safety, or tends to corrupt the. manners and morals of the people, may be abated, etc. And it is only such nuisances as these that the act of 1833 refers to, when, as codified in section 4762, it declares they may be abated by .order of the mayor or aldermen when they exist in incorporated towns. It will be noted that a nuisance injurious to the public health is expressly brought within its provisions, and that to this class of nuisances the entire act refers, including, as we have previously shown, a requirement that reasonable notice shall be given to interested parties of the meeting of the mayor and aldermen to pass on the same, before the order is issued. This act of 1833 is a public law, but, as seen in the *Minor* case, supra, it was ruled by this court that, notwithstanding it was a public law in force in 1871, the provisions in the charter of the town of Montezuma, passed by the legislature in that year, rendered inapplicable, as to the abatement of nuisances in that town, so much of the act as provided that where the nuisance complained of was a grist-mill it should be abated by the ordinary and a jury of the county. Practically this is the effect of the ruling made in that case. Other than to the town of Montezuma and other towns and cities in which its operation has been specially suspended by charter provisions, this act remains in full force.

By an act approved December 4, 1889, the General Assembly amended the charter of the City of Atlanta, and among other particulars the caption of the act recites that it is "to confer upon the recorder's or mayor's court of said city the jurisdiction now devolving upon the mayor and general council in the trial and abatement of certain nuisances as provided by the law of the State as contained in certain sections of the Code of Georgia." The amending act declares "that the jurisdiction now vested in the mayor and general council of said city, under and by the laws of this State as contained in the Code of . . 1882, in sections 4094 to 4100 inclusive, in respect to the trial and abatement of nuisances, as set. forth in said code and sections, be and the same is hereby devolved upon and vested in the recorder's or mayor's court of said city. Said recorder's or mayor's court shall have the same jurisdiction, power, and duty as to the trial and abatement of said nuisances as the mayor and general council of said city has heretofore had, and said mayor and general council are hereby relieved of jurisdiction and

duty to try, hear, or abate such nuisances; provided and except that nothing in this act contained shall divest the mayor and general council or board of health of said city of jurisdiction as to nuisances affecting health, as now provided by law." So that this act by its terms conferred upon the recorder's or mayor's court of the City of Atlanta all the jurisdiction as to the trial and abatement of nuisances contained in the act of 1833 in respect thereto, and those which were conferred on the authorities of the City of Atlanta by its charter, except jurisdiction as to nuisances affecting health. It will here be noted that this enactment was subsequent to the adoption of our present constitution, which declares that "no special law shall be enacted in any case for which provision has been made by an existing general law." The act of 1833 was, as we have seen, a general law. The act of 1889, amending the charter of the City of Atlanta, was a special law. The general act provided that nuisances in a town or city should be abated by the mayor and aldermen, etc. The special act conferred jurisdiction to abate such nuisances (or a class of them) on the recorder's or mayor's court. The special act recognized as applicable to the City of Atlanta the provisions of the act of 1833. Now, admitting, under the authority of the *Minor* case, supra, that prior to the adoption of the constitution of 1877 the General Assembly could by the terms of a special act vary the terms of a general law as to the abatement of nuisances in a particular city, it is difficult to perceive how, under the provisions of the constitution, the terms of a general law could be thus varied in 1889.

As illustrating the serious import of that question, attention is called to the case of *Connor* v. *Hall*, 89 *Ga.* 257. After the passage of this amendment to the charter in 1889, Hall filed a petition in the recorder's court, asking for an order to abate an alleged nuisance (a fence across an alley). This application was resisted, and a plea to the jurisdiction of the recorder was filed. After an adjudication that the nuisance existed, and an order by the recorder that it be abated, the defendant sued out a certiorari to the superior court, alleging that the judgment was contrary to the law and the evidence. The certiorari was overruled, that judgment was excepted to, and the case brought here. This court, after ruling on a point not material to be considered in this connection, ruled that, as no question as to the jurisdiction of the recorder was raised, it

was not apparent that the judge of the superior court erred in affirming the judgment of the recorder. Subsequently the defendant·in that judgment filed an application to enjoin its enforcement, on the ground that the recorder had no jurisdiction to try the same, and that the judgment rendered by him was void. The allegation of a want of jurisdiction in the recorder rested on the unconstitutionality of this act of 1889, because it was in conflict with the provision of the constitution to which we have just referred; and thereupon the plaintiff proposed to show that the erection of the fence was not a nuisance. The trial judge rejected this evidence, and ruled that the question of jurisdiction was settled by the former judgment, which was conclusive of every question that was or might have been made, and denied the application. In ruling upon the correctness of that judgment this court said, that when it appeared that a person was cited before the recorder's court to show cause why he should not abate a nuisance, that he appeared and among other defenses pleaded to the jurisdiction of the court, that the plea was overruled and the case tried upon its merits, and he was ordered to remove the nuisance, and thereupon he took the case to the superior court by certiorari, and did not assign error upon the judgment overruling the plea to the jurisdiction, there was no error in refusing to grant such person an injunction to prevent the city marshal from enforcing the judgment by removing the nuisance. *Connor* v. *Hall,* 91 *Ga.* 62. It would thus seem that the constitutionality of this amendment to the charter of Atlanta was at least doubted. Subsequently to these decisions (the latter having been rendered October 31, 1892), the General Assembly passed a bill, which was approved December 12, 1892, to amend the provision of the code which, as part of the act of 1833, declared that if the nuisance existed in a town or city it might be abated and removed by order of the mayor, etc. This amendment, which was proposed in a bill introduced by Mr. King, one of the then representatives of the County of Fulton (Journal House Rep. 1892, p. 61), and which afterwards became a general law, was in the following words: "But if the nuisance complained of exists in a city having twenty thousand population or more, the police court of such city, whether known as mayor's or recorder's court, or otherwise designated, shall have jurisdiction to hear and determine the question of the existence of such nuisance, and, if

found to exist, to order its abatement, which order shall be directed to and executed by the sheriff or marshal of said town or city, or their deputy." This act contained the usual clause repealing all laws and parts of laws in conflict therewith.

So that the general law of 1833, which provided that nuisances in a city might be abated by the mayor and aldermen, was thus amended by the act of 1892, so that if the nuisance existed in a city having a minimum population of twenty thousand, the jurisdiction to abate the nuisance should be exercised by the police court of that city, and not only so, but the officer presiding in that court should hear and determine the question of its existence before ordering its abatement. And it appears that such change was at the instance of the City of Atlanta through one of its worthy and able representatives. No other conclusion can be drawn from this enactment than that all the power conferred on the City of Atlanta (including its board of health) to abate a nuisance manifestly injurious to the public health was taken away thereby, and jurisdiction thereof vested in the mayor's or recorder's court for hearing and determining the question whether such nuisance exists. It must be understood, however, that, in so ruling, those things which are declared either by the common or statute law to be nuisances, or which are nuisances per se and from their very nature are indisputably so, are not included either in the ruling or in what has been said in the way of argument. As we have endeavored to show in the first division of this opinion, as to them no inquiry is necessary, because they have been so pronounced, or their character as such can not be denied. In opposition to the view which we have just taken of the nature of the act of 1892, it is claimed that that act does not operate as a repeal of the provisions of the charter of the City of Atlanta as to the abatement of nuisances, and it is urged that repeals by implication are not favored. We assent to the correctness of the latter proposition; but, while not favored, the repeal of a special statute or particular parts thereof results by operation of law under certain well-defined rules. If this act repeals the charter provisions of the City of Atlanta, such repeal is by implication; and just here it may be observed that the test whether such repeal has been effected is, whether it was the intention of the General Assembly that such should be its effect. Concerning the repeal by implication of a general law by

the enactment of another general law, Mr. Sedgwick, in his work on the Construction of Statutory and Constitutional Law (2d ed.), 104, says: "It is equally well settled that a subsequent statute which is clearly repugnant to a prior one necessarily repeals the former, although it do not do so in terms; and even if the subsequent statute be not repugnant, in all its provisions, to a prior one, yet if the later statute was clearly intended to prescribe the only rule that should govern in the case provided for, it repeals the original act." Mr. Sutherland in his work on Statutory Construction, 179, says, on the same subject: "An implied repeal results from some enactment the terms and necessary operation of which can not be harmonious with the terms and necessary effect of the earlier act." To the same effect see also Potter's Dwarris on Statutes, 154, and Endlich on the Interpretation of Statutes, 280; with which rule the decisions of this court are in harmony. *Girardy* v. *Dougherty*, 18 *Ga.* 262; *Erwin* v. *Moore*, 15 *Ga.* 361; *Johnson* v. *B. & L. Asso.*, 97 *Ga.* 622.

The exact question, however, is whether the repeal of a special act is necessarily effected by the enactment of a general law covering same subject; and it must be conceded that, as a rule, this effect is brought about less readily than where both the repealed and repealing statutes are in the form of general laws. Nevertheless it rests upon the intention of the lawmakers; and we apprehend that the rule is, when a general law is enacted, making certain provisions in relation to all the towns of this State, and the provisions of the enactment clearly manifest that it was the purpose of the lawmakers to establish a given condition in all of such municipalities, that the terms of such general law will supersede the rights and powers given to any particular municipality by its charter. Citing a number of authorities for the proposition, Judge Dillon (1 Dill. Mun. Cor. § 85), says: "The powers conferred upon municipal corporations may at any time be altered or repealed by the legislature, either by a *general law* operating upon the whole State, or, in the absence of constitutional restriction, by a *special act*." Also, upon the authority of a number of later cases for his text, Mr. Tiedeman in his treatise on the Law of Municipal Corporations, § 32, declares: "The powers and privileges conferred upon a municipal corporation by act of the legislature may at any time be repealed or amended by the legislature, either by a general law applicable to all munic-

ipal corporations throughout the State, or, in the absence of constitutional limitations, by a special act applying to the particular corporation." It was ruled by the Supreme Court of Pennsylvania in the case of Nusser v. Commonwealth, 25 Pa. St. 126, that a general act prescribing the mode of punishment of a specific offense throughout the State operates to repeal an act limited to a single county, prescribing the mode of punishment for the same offense within the designated county. To the same effect see State v. Pearcy, 44 Mo. App. 159, in which case the repeal seems to have been based on the proposition that by the enactment of a general law it was the manifest purpose of the legislature to produce uniformity. A number of authorities are cited in note 1, page 214, by Mr. Sutherland in his work above cited, to support what he declares to be the doctrine in such cases, which the text states as follows: "There is no rule of law which prohibits the repeal of a special act by a general one, nor is there any principle forbidding such repeal without the use of words declarative of that intent. The question is always one of intention, and the purpose to abrogate the particular enactment by a later general statute is sufficiently manifested when the provisions of both can not stand together." In the case of *Pausch* v. *Guerrard*, 67 *Ga.* 319, this court seems to have recognized the rule above announced as law in this State, when it ruled that "while ordinarily a general law does not repeal a prior local law, unless the law be specially named or necessarily embraced in the terms used, yet where it is apparent from the act itself and the constitution of the State that it was intended to embrace the local law, the latter will be held to be modified or repealed thereby."

But as being conclusive, on principle, of the question under consideration the case of *Crovatt* v. *Mason*, 101 *Ga.* 246, is directly in point. A general act of this State provides that after its passage aldermen of towns and cities of this State, except in towns and cities of less than two thousand inhabitants, shall be incompetent to hold any other municipal office during the term for which they are chosen. In the case just cited the defendant in error resided in Brunswick. He was, in December, 1895, elected an alderman of that city for a term of two years. During his term he was elected mayor. His eligibility to this office was questioned, and he replied that under the terms of the charter of Brunswick, granted prior to the enactment of the general law, he was eligible to be

elected mayor while holding the office of alderman.   It was said in
the opinion in that case that, as the act bears uniformly upon all
towns and cities throughout the State which are included and come
in the class concerning which the legislation is had, the law is a
general one; and that the contention that a special act which de-
clared what persons were eligible to the office of mayor of the city
of Brunswick was not modified by the general act was unsound;
that "it was the legislative act which created the municipal corpora-
tion of Brunswick and prescribed the manner in which the offices
of the corporation should be filled; having done so it remained in
the power of the legislature to change that method at will; and
we know of no reason why this can not be legitimately done
by a general statute declaring and fixing the policy of the State in
all cities and towns of a certain class."   It is not possible that the
terms of the general act of 1892 in relation to the abatement of
nuisances in the City of Atlanta and the provision of the charter
of the City of Atlanta in respect thereto can be construed so as to
stand together.   The charter confers the power to abate on the
mayor and general council, and the board of health.   The general
statute, before it was amended, conferred it on the mayor and alder-
men, and there was little difference in the provisions of the general
statute and the charter in this regard.   The amendatory act of
1892 left the power to abate nuisances in the towns and cities of
this State, where the general act of 1833 had placed it, except as
to those cities which have a population of twenty thousand or more,
to which latter class Atlanta belongs, and as to these the power to
abate nuisances is vested in the police court.   The jurisdiction thus
conferred must be exclusive; otherwise the general act would have
to be construed as applying to some of the cities of the class named,
and not to others.   Being a general law, it must have general ap-
plication to all cities coming within the class.   That such was
the intention of the lawmakers is manifest, not only because it was
expressly made general by its terms, but in words it declares that
all laws in conflict with its provisions are repealed.   It must there-
fore be held, as a matter of law, that the power to abate nuisances of
the kind in question is vested in the recorder's court of the City of
Atlanta, and that at the time the board of health undertook to re-
move the floor of the union passenger station in Atlanta, because
it was alleged to be a public nuisance, it had no authority to do so;

and inasmuch as it is not only alleged, but shown, that the damages which would have been sustained by plaintiffs in error would have been irreparable in their nature if the removal of the floor was continued, the trespass thus being committed should have been enjoined.          *Judgment reversed.    All the Justices concurring.*