## No. 12,380.

### COLORADO UTILITIES CORPORATION *v.* CASADY.
(300 Pac. 601)

Decided June 1, 1931.

Messrs. GRANT, ELLIS, SHAFROTH & TOLL, for plaintiff in error.

Mr. W. C. REILLY, Mr. J. F. MEADOR, for defendant in error.

*In Department.*

MR. JUSTICE BUTLER delivered the opinion of the court.

MILO Edwin Casady, a minor, herein referred to as Milo, or the plaintiff, recovered judgment against the Colorado Utilities Corporation, called herein the defendant, in a personal injury action.

In November, 1926, the defendant constructed an electric transmission line along the side of the main highway running west from Steamboat Springs. At the place where the accident occurred, about four miles from Steamboat Springs, the road passed through a cut. The south bank was very low. The north bank was about eight or ten feet high. The soil there was "very soft and muddy," due to spring weather conditions at the time. The poles supporting the wires at that point were placed on the north bank, two of them being close to the edge. The third, referred to as the angle pole, or the corner pole, was placed at an angle in the road, where the road turned about twenty degrees toward the south. It was several feet back from the edge of the cut, and had a guy wire, to which was attached an anchor (a buried metal disk), on its north side. On the day of the accident three wires, carrying a current of about 14,000 volts, were hanging from pendants attached to the poles. Frost coming out of the ground and water running down the bank caused the soil to slough away, so that the top of the bank slid off some four feet to the north, removing practically all the dirt from around one of the poles, thereby putting a strain upon the guy wire and anchor attached to the angle pole. Owing to the moisture and the strain, the anchor pulled out of the soil, thereby causing one of the poles to fall down until the end of its cross-arm touched the ground practically in the center of the road. One of the wires was within about four inches of the surface of the road.

On April 10, 1927, between one and two o'clock in the afternoon, Milo, then nine years of age, and two other children, each about eleven years old, arrived at the cut in an automobile driven by one Hill, the grandfather of one of the children. Upon noticing the condition above described, Hill stopped some 200 feet from the fallen pole, and attempted to turn around. His machine became mired in the ditch, and he got out and "started to dig it with a shovel." While he was thus engaged, the children,

without his knowing it, got out of the car on the opposite side and went close to the wires. Milo did not come in contact with the wire—he testified that he was a foot and a half away—but he was so close that the electric current "jumped" from the wire to a toy pistol in the right hand of the boy, and passed through his body and into the ground through his feet. He was severely injured. The lower half, or more, of his right arm was destroyed and had to be amputated. He suffered other permanent injuries. His arms, feet, body and face were badly burned. He was in a hospital for two months and a half, and in a doctor's care for more than ten months. Previous to the accident he was in good health. Since then, according to the testimony of his mother, he has been very nervous, and has been unable to concentrate his mind on his work at school.

█ 1. On November 12, 1928, the case was set for trial as the third jury case. The next day the defendant applied for a short continuance to allow a witness to arrive from Cuba. The application was denied. On the 19th there was filed another motion for a continuance, which was denied. The trial commenced on the 20th.

The affidavit in support of the applications for a continuance contained a statement of the evidence that it was expected the absent witness would give, and the plaintiff's attorneys admitted that the witness, if present, would so testify, and that such evidence might be considered as actually given on the trial. Section 195 of the Code of Civil Procedure of 1921 provides that in such circumstances "the trial shall not be postponed." Assuming the soundness of the contention that, notwithstanding the language of the Code, the matter was discretionary with the trial court, an examination of the record does not satisfy us that the court's discretion was abused.

█ 2. There was sufficient evidence to support the jury's finding that the defendant was negligent, and that

its negligence was the proximate cause of the injuries sustained by Milo.

The witness Dismukes, an engineer of the highway department, resided at Steamboat Springs nineteen years. He testified that the soil at the place of the accident is very fine—a fine texture mixed with shale; that in places like that where it has slid, it is almost impossible to tell how long that is going to keep on sliding; that considering the condition of the soil and the pitch of the slope, he "would not have put a pole on the north side there at all," because he "would have been afraid that the earth would have sloughed off there and the thing gone down." He also said that in the spring of 1925 the bank slid in or sloughed; that they thereupon made it a one-to-one slope and "figured" that the slope would hold, but that in the spring of 1926 "it sloughed off, some work there, if I remember right."

Hoklas, a civil engineer, who had been engaged as a location and construction engineer by the defendant for some parts of its line, testified in part as follows: "Q. Now state to the jury what may reasonably be expected in the erection of poles at the edge of cuts of this character in a formation of that character with reference to the sloughing off and the pole falling? A. There is a very common possibility of such a condition on the edge of a cut. Any cut—other than solid rock—is liable to slough and slip in places of shale, and the danger in a power line, or any line for that matter, is too great to erect and keep it if there is a cut. Q. From your experience and observation in these matters, Mr. Hoklas, what have you to say as to whether or not it is possible to erect poles carrying wires of that character at the edge of a cut, with formation similar to this? A. It would not be good construction, would not be a proper system of erection. Q. Mr. Hoklas, when you were there after the accident did you observe the extent of the sloughing of that bank? A. Yes, sir. Q. Tell the jury about that? A. It was badly sloughed off and slid; I would judge that the

top of the cut was slipping back some four feet, or such a matter, and that has sloughed off to the side and was into the edge of the highway at that time.'' He said that the anchor had been placed in the ground about two feet; that it was not large enough or deep enough; that it had been set during freezing weather, and for that reason could not have been tamped very tightly. ''Q. Did you make any examination from which you could reach any conclusion as to what was put in on top of this anchor? A. The soil. Q. You saw no other indication? A. No other indication about there.''

Leckenby, a witness for the defendant, testified that he had charge of the erection of the pole line; that the holes were five feet deep for thirty-foot poles; that the anchor at the corner pole was set five feet deep; that two and a half feet of rock were placed on top and then dirt put in and tamped down; that that was in November, 1926, and that two inches of frost was the maximum on any morning. The defendant's witness Chambers testified that he located the line in November, 1926; that there was practically no frost; that in the spring of 1927 the ground there was more saturated than usual; that this tended to make the ground slide; and that ''there were other slides at this time.''

The question of the defendant's negligence in erecting and maintaining the poles was submitted to the jury under proper instructions, and the finding on that question was against the defendant. We cannot disturb that finding.

 3. After alleging negligence in setting and maintaining the poles and wires upon the edge of the cut, placed at insufficient depth in the ground, and without braces and appliances buried sufficiently deep to support the poles, the complaint added the averment that the defendant knowingly permitted the poles and wires to remain in, upon and obstructing the highway ''for more than twenty-four hours'' prior to the accident. It is said that as the evidence did not show that the poles and wires

were actually lying in, upon and obstructing the highway for twenty-four hours, but only for a shorter time, there was a variance. Counsel admit that it was possible for the plaintiff to amend the complaint to meet the proof, but say that no such amendment was made, and that therefore the court's statement in an instruction that the plaintiff claimed that the pole was down for "several hours" prior to the accident submitted an issue not made by the pleadings. We cannot agree with that contention.

4. It seems to be the position of counsel for the defendant that in order to impose a duty upon the defendant to remedy the condition existing prior to the accident, it must have had notice that the poles and wires were actually lying upon the ground, and that the evidence does not show notice of such condition a sufficient length of time before the accident to charge the defendant with negligence in failing to correct the condition.

Counsel for the defendant admit, what the evidence clearly established, that "There is no doubt about there having been numerous reports made about the leaning pole"; that "knowledge of the leaning pole was certainly brought home to the plaintiff in error." They say, however, that no report was ever made to the defendant of the "fallen pole"; that "the pole fell completely down some time in the two-hour period before the accident." Coyne, a witness for the defendant, testified that at 8 o'clock on the morning before the accident he noticed that the pole was leaning some; that in the evening it was leaning about forty-five degrees; that about 8 o'clock on the morning of the accident the pole was leaning "perhaps half way between forty-five and ninety degrees"; that between 10 and 11 o'clock it was pretty nearly straight out from the bank, with the top about twelve feet above the highway; and that the accident occurred between 1 and 2 o'clock in the afternoon. Another witness testified that between 6 and 6:30 o'clock p. m. the day before the accident the pole had become freed from the dirt and had slid down the hill "on account of the

sloughing bank''; that the top of the pole was about nine feet above the highway; that he saw an employee of the defendant that evening and told him that it looked like the line was in bad condition and that there were chances it would fall over before night, so that anybody going around the curve of the road might run into the high voltage line and have an accident. And another witness testified that about 11 o'clock on the morning of the accident he found the pole lying down in the road; that the bottom wire was about eight or ten inches above the road. Another witness, who saw the condition the evening before the accident, testified that he discussed the matter that evening with an employee of the defendant at the defendant's office, and told him that the pole was leaning, that the bank was sloughing off, and that there was danger of its falling down. The same witness also saw the condition about 9:30 a. m. on the morning of the accident, and at about 12 o'clock he told the defendant's electrician and lineman, who was in charge at the time, that the line was almost down, and that he had better get it fixed. This conversation was admitted by the defendant. In the affidavit in support of the defendant's motion for a continuance, it is stated that this same employee had been informed on the afternoon of the preceding day that the pole was leaning some, and was asked to make an inspection for the defendant, and that he made an inspection between 5 and 6 o'clock in the afternoon of the day before the accident and found that one pole was leaning, but that the corner pole held securely by the anchor.

The contention that no duty to correct the condition arose until the pole and wires actually lay upon the ground, and that the defendant could not be charged with negligence until it had received actual notice of such condition and had failed to remedy it within a reasonable time thereafter, does not appeal to us as sound. The defendant knew that the road was the main highway between Steamboat Springs and western points; that there was considerable travel on that road; that the poles were

placed near the edge of the cut; that the soil there was very fine and was water-soaked; that the bend in the line put a heavy strain upon the angle pole and caused a strong pull toward the middle of the road; that the defendant had received numerous reports the day before the accident and on the morning of the day of the accident to the effect that one of the poles was leaning; that the defendant's own electrician and lineman saw the leaning pole between 5 and 6 o'clock p. m. the day before the accident; that on that same evening the bank was sloughing off and that there was danger of the pole's falling down; and that the wires were charged with a deadly electric current of about 14,000 volts. According to the evidence for the plaintiff, which we must assume was believed by the jury, the poles were placed at an insufficient depth, and the anchor attached to the angle pole was of insufficient size, had been sunk only two feet, had been set in freezing weather, and was covered with soil only, which was not tamped very tightly.

The jury was justified in its finding that the defendant knew of the dangerous condition in sufficient time to enable it, in the exercise of reasonable care, to remedy the condition before the accident, and that, in failing to do so, it was guilty of negligence.

5. Counsel for the defendant say that Milo was guilty of contributory negligence, and for that reason was not entitled to judgment.

Hill testified that when he saw the pole down in the road, he said, "We have got to stop and go back and report these poles; somebody will get killed." One of the children, also, testified that Hill made that statement, and another testified that Hill said that somebody would get hurt. There is no evidence that he warned the children about the danger of approaching the wires. There is no evidence that Milo heard what Hill said about somebody's getting killed or hurt, and Milo testified that he did not hear the statement. Even if he did hear, a child of his age could not be charged, as a matter of law, with

knowledge of the source, nature or extent of the danger that later resulted in injury to Milo. A pole lying in the middle of the road, of course, may cause injury, or even death, to one driving an automobile in the nighttime, but that was not the danger that menaced Milo. If Milo knew that the wire was carrying an electric current—and there is no evidence that he did—it would not necessarily indicate that he appreciated the danger. Even if he knew that the wire carried 14,000 volts, and understood the danger of coming in actual contact with the wire, the contention that he appreciated the danger of merely going near the wire with a toy pistol in his hand, presupposes a knowledge on the part of the boy equal, or nearly equal, to that of the expert electrician who, testifying for the defendant concerning the distance that a spark may "jump" from an electric wire toward an object, said that it depended upon the nature of the object, whether or not it is "perfectly" grounded, the altitude, the condition of the atmosphere, the absence or presence of moisture, the temperature, and so forth.

Minors not prima facie sui juris are required to exercise only such care to avoid danger as might fairly and reasonably be expected from persons of their age. If there is a fair doubt as to a child's being of the age and capacity that in law would charge it with responsibility for the act contributing to its injury, the question should be submitted to the jury. *Richardson v. El Paso Consolidated Gold Mining Co.*, 51 Colo. 440, 118 Pac. 982; *Pueblo Electric Street Ry. Co. v. Sherman*, 25 Colo. 114, 53 Pac. 322; *Denver City Tramway Co. v. Nicholas*, 35 Colo. 462, 84 Pac. 813; *Kopplekom v. Colorado Cement Pipe Co.*, 16 Colo. App. 274, 64 Pac. 1047; *Walters v. Denver Consolidated Electric Light Co.*, 12 Colo. App. 145, 54 Pac. 960; *Union Pacific R. Co. v. McDonald*, 152 U. S. 262, 14 Sup. Ct. 619.

In the Richardson case, supra, the court said of a boy nine years old, who had fallen down a mine shaft: "The deceased, by reason of his age, was not *prima facie sui*

*juris.* \* \* \* The question then presented is, whether or not he was capable of appreciating the danger to which he was exposed in removing a board and attempting to replace it by stepping upon it. \* \* \* In the circumstances of this case, we think this was a question of fact, to be determined by the jury, and not one of law for the court."

In the Walters case, supra, a child twelve years old was injured by taking hold of an uncovered live electric wire. The court held that the child was not, as a matter of law, guilty of contributory negligence, but that the question was one of fact for the jury.

■ In the present case the question of contributory negligence on the part of this nine-year-old boy was submitted to the jury under proper instructions, and answered in favor of the plaintiff. We would not be warranted in disturbing that finding.

■ 6. On the measure of damages, the court instructed the jury as follows: "Where a minor has suffered a permanent injury, and such minor is too young to have selected an avocation or to begin to illustrate his earning capacity, in such cases there is no measure as to the amount of damages, where such minor is entitled to recover therefor, except the enlightened consciences of impartial jurors, guided by all the facts and circumstances of the particular case. Therefore, if, under the rule of law given you, you should find by a fair preponderance of the evidence in this case that the plaintiff, a ten year old boy, is entitled to recover, in estimating his damages you may consider the pain and suffering he may have endured at the time of and since the accident and injury, the mental suffering he may experience throughout life by reason of the injury to his body and the impairment of his physical strength and vigor, as the result of the accident and injuries; the effect of such injury on his nervous system, if you find the nervous system of the plaintiff has been impaired by reason of such injury, and the shock incident to and connected with the injury, the

probable duration of the injury to the nervous system and body of the plaintiff, together with the probable effect in the future on the mental and physical condition of the plaintiff resulting from the impaired nervous system and bodily affliction, if any, which may have been proven by a fair preponderance of the evidence. After all, in estimating these damages there is no other standard or measure than your enlightened consciences and your impartiality under your oaths as jurors. In the case of Milo Casady, the plaintiff is then entitled to recover such an amount of money as shall reasonably compensate him for his injuries, suffering and disabilities, in so far as the same have been satisfactorily proven to have resulted from this accident, but not in any event more than the amount * * * sued for." The defendant objected to the instruction "for the reasons that the same are [is] not based upon any evidence in the case and do [does] not state the law; that it is improper to instruct the jury that the only measure of damages is the enlightened consciences of impartial jurors; that it is incorrect to include in such instruction or specifically mention the amount of suffering that may be experienced throughout life by the plaintiff Milo; that it is improper to make specific reference to the evidence upon the nervous system, either under the law or under the evidence in this case."

The instruction is not open to any of the objections specified. *Atlanta, Knoxville & N. Ry. Co. v. Gardner,* 122 Ga. 82, 49 S. E. 818; *Western & Atlantic R. R. Co. v. Young,* 81 Ga. 397, 7 S. E. 912; *Davis v. Central Railroad,* 60 Ga. 329; *Florence & Cripple Creek R. R. Co. v. Kerr,* 59 Colo. 539, 542, 151 Pac. 439. *Pawnee Farmers Elevator & Supply Co. v. Powell,* 76 Colo. 1, 227 Pac. 836, is cited by counsel for the defendant, but the facts and the instruction there were entirely different from those in the present case.

There is another objection suggested in the brief of counsel, but as it was not specifically made in the lower

court before the instructions were given to the jury, we will not consider it. Supreme Court rule No. 7.

The several assignments of error are without merit.

The judgment is affirmed.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE MOORE and MR. JUSTICE BURKE concur.